**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

UNITED STATES OF AMERICA, ex rel.
JOSEPH C. AMICO

|  |  |  |
|---|---|---|
| Plaintiff/Relator, | : | FILED UNDER SEAL |
| | : | |
| against | : | |
| | : | |
| HSBC BANK USA, NATIONAL ASSOCIATION; | : | _____ CIV _____ |
| HSI ASSET SECURITIZATION CORPORATION; | : | |
| HSBC MORTGAGE CORPORATION (USA); | : | |
| DECISION ONE MORTGAGE COMPANY, LLC; | : | **MOTION TO FILE COMPLAINT** |
| HSBC SECURITIES (USA) INC.; HSBC | : | **UNDER SEAL** |
| MARKETS (USA) INC.; HSBC USA INC.; HSBC | : | |
| HOME EQUITY LOAN CORPORATION I; HSBC | : | |
| HOME EQUITY LOAN CORPORATION II; HSBC | : | |
| FINANCE CORPORATION; HSBC HOLDINGS | : | |
| PLC. | : | |
| | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------

Pursuant to the requirements of 31 USC § 3730(b)(2), Plaintiff-Relator moves for

entry of an order granting leave to file under seal Plaintiff-Relator's Complaint, as

attached herewith.

1. Plaintiff-Relator brings the within claims on behalf of the United States of

America pursuant to the False Claims Act, 31 USC §§ 3729 et seq.

2. Section 3730(b)(2) of the False Claims Act provides that the Complaint in an action brought thereunder "be filed in camera, [and] shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." 31 USC § 3730(b)(2).

3. Should the Court direct that the Complaint be filed under seal, Plaintiff-Relator will file a sealed copy of the Complaint and all exhibits with the Clerk of Court. The originals of these materials will be submitted to the assigned judge.

WHEREFORE, Plaintiff-Relator respectfully submits this motion and proposed order pursuant to 31 USC § 3730(b)(2) of the False Claims Act, 31 USC § 3729 et seq.

Dated: March 17, 2016                    Respectfully submitted,

Francis P. Karam
Law Office of Francis P. Karam
175 Varick Street, #345
New York, NY 10014
Phone: (212) 489-3900
E-Mail: frank@fkaramlaw.com

*Counsel for Relator*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

UNITED STATES OF AMERICA, ex rel.
JOSEPH C. AMICO

|  |  |  |
|---|---|---|
| Plaintiff/Relator, | : | FILED UNDER SEAL |
| | : | |
| against | : | |
| | : | _____ CIV _____ |
| HSBC BANK USA, NATIONAL ASSOCIATION; | : | |
| HSI ASSET SECURITIZATION CORPORATION; | : | |
| HSBC MORTGAGE CORPORATION (USA); | : | **COMPLAINT** |
| DECISION ONE MORTGAGE COMPANY, LLC; | : | |
| HSBC SECURITIES (USA) INC.; HSBC | : | |
| MARKETS (USA) INC.; HSBC USA INC.; HSBC | : | JURY TRIAL DEMANDED |
| HOME EQUITY LOAN CORPORATION I; HSBC | : | |
| HOME EQUITY LOAN CORPORATION II; HSBC | : | |
| FINANCE CORPORATION; HSBC HOLDINGS | : | |
| PLC. | : | |
| | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------------

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION..............................................................................5

    A.    RELATOR'S INFORMATION.................................................................12

II.   PARTIES.......................................................................................................19

    A.    THE PLAINTIFF...................................................................................19

    B.    THE RELATOR.....................................................................................19

    C.    THE DEFENDANTS.............................................................................19

    D.    THE NON-PARTY ORIGINATORS.....................................................21

    E.    THE GOVERNMENT PURCHASERS..................................................22

III.  JURISDICTION AND VENUE....................................................................23

IV.   CONDITIONS PRECEDENT.......................................................................23

V.    FACTS COMMON TO ALL COUNTS........................................................24

    A.    MBS BACKGROUND...........................................................................26

    B.    THE HSBC RMBS PROCESS.............................................................27

    C.    THE HSBC CDO PROCESS.................................................................31

    D.    RELATOR'S REVIEW OF THE BORROWERS AND COLLATERAL PROPERTIES REVEALS FRAUD..................................................................32

    E.    BORROWERS AND COLLATERAL PROPERTIES............................36

    F.    DEFENDANTS FAILED TO APPROPRIATELY TRANSFER LOANS TO THE MBS TRUSTS...................................................................................54

VI.   DEFENDANTS' USE OF FALSE RECORDS AND/OR STATEMENTS.....................57

    A.    DEFENDANTS' USE OF REGISTRATION STATEMENTS AND OFFERING DOCUMENTS TO FURTHER THEIR SCHEME................................57

B.  DEFENDANTS USED NON-DELIVERY OF LOAN DOCUMENTS TO CONCEAL UNRELIABLE BORROWERS AND OVERVALUED PROPERTIES.................................................................67

C.  DEFENDANTS FAILED TO COMPLY WITH UNDERWRITING GUIDELINES DESPITE REPRESENTING THEY WOULD IN THE OFFERING DOCUMENTS......................................................69

D.  DEFENDANTS OMITTED AND MISREPRESENTED MATERIAL INFORMATION IN THE OFFERING DOCUMENTS FOR THE CDOS....................................................................79

    1.  HSBC PURCHASED CREDIT PROTECTION FROM AIG AND SOLD CDOS TO MAIDEN LANE III..............................82

E.  DEFENDANTS CONTROLLED AND DIRECTED EVERY STEP OF THE SECURITIZATION PROCESS......................................83

F.  SALES OF RMBS TO AIG UNDER AIG'S SECURITIES LENDING PROGRAM AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH.................................................................85

G.  DIRECT LOANS SALES TO FHLMC AND FNMA AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH................87

H.  DIRECT LOAN SALES TO MORGAN STANLEY AND GOLDMAN SACHS (AND OTHER THIRD PARTY SPONSORS OF RMBS) AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH................89

VII.  THE U.S. GOVERNMENT FUNDED THE PURCHASE OF MBS AND CDOS AND SUFFERED SUBSTANTIAL LOSSES................................................91

A.  PURCHASES BY THE U.S. GOVERNMENT...................................91

B.  DAMAGES TO THE U.S. GOVERNMENT........................................93

    1.  IMPAIRED VALUE OF MBS.......................................93

    2.  IMPAIRED VALUE OF CDOS......................................95

    3.  DAMAGE TO FANNIE MAE AND FREDDIE MAC...............95

    4.  DAMAGES TO THE FAILED CREDIT UNIONS, THE FAILED BANKS, THE FAILED PENSION PLANS................................96

    5.  DAMAGES FROM AIG BAILOUT...................................97

VIII.   CLAIMS FOR RELIEF.................................................................................98

    A.    Damages and Penalties Under the False Claims Act (31 U.S.C. §
    3729(a)(1)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))....................................98

    B.    Damages and Penalties Under the False Claims Act (31 U.S.C. §
    3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))....................................101

    C.    Damages and Penalties Under the False Claims Act (31 U.S.C. §
    3729(a)(7)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(G))....................................102

IX.    PRAYER FOR RELIEF..................................................................................104

X.    DEMAND FOR TRIAL BY JURY.....................................................................104

ANNEX A.........................................................................................................106

ANNEX B.........................................................................................................108

ANNEX C.........................................................................................................109

ANNEX D.........................................................................................................113

The United States of America, by and through Joseph C. Amico as Relator, brings this action against Defendants HSBC HOLDINGS PLC; HSBC BANK USA, NATIONAL ASSOCIATION ("HSBC Bank"); HSI ASSET SECURITIZATION CORPORATION ("HSI"); HSBC SECURITIES (USA) INC. ("HSBC Securities"); HSBC MORTGAGE CORPORATION (USA) ("HSBC Mortgage"); DECISION ONE MORTGAGE COMPANY, LLC ("Decision One"); HSBC MARKETS (USA) INC.; HSBC HOME EQUITY LOAN CORPORATION I ("Home Equity I"); HSBC HOME EQUITY LOAN CORPORATION II ("Home Equity II"); HSBC FINANCE CORPORATION, successor to Household Finance Corp. ("HSBC Finance") and HSBC USA INC. (collectively or individually, "HSBC" or "Defendants") alleging as follows:

## I.   NATURE OF ACTION

I.   This is an action under the False Claims Act ("FCA") by the United States of America, as related by Joseph C. Amico, to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 et seq.[1] arising from Defendants' creation and sale of certain residential mortgage-backed securities ("RMBS," or generally, "MBS") and collateralized debt obligations ("CDOs") and the purchase of those securities using funds provided, insured, guaranteed or otherwise made available by the United States Government ("US Government"). The MBS covered by this Complaint are set forth on Annex A (Annex A is deemed to include both (i) all other

---

[1] This action is brought pursuant to both the FCA as it stood prior to the enactment of the Fraud Enforcement and Recovery Act of 2009 (the "FERA") and the FCA as amended by the FERA. Defendants' false and fraudulent statements and/or omission were made for the first time prior to 2009, have never been retracted or corrected and endure in form and effect to the present. This Complaint includes claims relating to the U.S. Government's financing, insuring, and guaranteeing of MBS and CDOs both before and after 2009.

MBS for which Defendants served as sponsor, depositor or underwriter/placement agent, and (ii) third-party MBS for which HSBC Mortgage or Decision One acted as originator and which included a description of HSBC Mortgage or Decision One and its underwriting standards in the related prospectus supplement for such third-party MBS, but which are not listed on Annex A). The CDOs covered by this Complaint are set forth on Annex B (Annex B is deemed to include all other CDOs for which Defendants served as underwriter/placement agent and CDOs for which Defendants purchased credit protection from AIG and received proceeds from Maiden Lane III for the purchase of such CDOs, but which are not listed on Annex B).

2.    All of the allegations contained in this Complaint are based on Relator's direct knowledge of Defendants' wrongdoing. Relator gained this knowledge both from his professional experience and from his discovery of Defendants' mortgage loans and the related collateral properties. Relator's investigation and discovery of the loans and properties on which the complaint is based requires a unique blend of Relator's experience and knowledge of the mortgage security business and structured financial products. In addition, to discover the loans and properties in the Defendants' RMBS, Relator had to create and invent unique algorithms, methods, techniques and strategies to find and identify loans hidden from persons of average capability. The process was extremely lengthy and time consuming. After locating and identifying loans and properties in Defendants' RMBS, more time was consumed devising and creating a method of presenting the enormous amount of information so that a person could understand what occurred.

3.    Relator was an employee of a competitor of Defendants during the period 2000-2002. Through that employment, Relator came to know of the mortgage, mortgage security, CDO and Credit Default Swap businesses, the various competitors and their practices within each and the trends in each business. Relator gained knowledge of his employer's and its competitors practices for originating mortgages (directly and through correspondents), creating mortgage securities, creating CDOs, writing and trading Credit Defaults Swaps, and profiting from each business.

4.    Relator learned of diminishing standards in the mortgage and mortgage security businesses during mid-2002 when an executive from his employer's mortgage security group asked Relator for his help creating a competitive advantage by resolving tax issues involving such mortgage securities. To perform this work task, Relator did a complete analysis of the RMBS business, the competitors and its trends. Specifically, Relator learned the details of the "whole loan" and "wholesale" mortgage business. Relator's work tasks made him aware that the creditworthiness of the mortgage borrowers and the value of the collateral properties were secondary and tertiary considerations. To paraphrase an executive of his employer: "we don't care about the borrower or the property since we aren't holding the loan. We are packaging the loans into a security and selling it as a blind pool to investors. We are only concerned about the volume. [This particular originator] said he can deliver us 400 loans per month, which is all we are concerned about."

5.    Relator learned of the packaging of unsellable securities (including RMBS securities) into CDOs during 2000-2 in his tenure in his employer's CDO and Credit Default Swap group (Structured Transactions). Relator's business Unit was involved in the Enron

transactions and when that business fell apart, the group quickly moved on to creating CDOs from piles of unsellable securities (including RMBS). Unsellable securities arose from a number of issues, including lack of liquidity or a market, mis-pricing (too expensive or too cheap); undesirable credit, etc. The explosion in CDO offerings began at the end of Relator's tenure in the group and continued unchecked in step with the growth of RMBS issuance. From his job, Relator knew of the activities of his own group as well as the activities of most (if not all) of its competitors.

6.     Relator learned of the RMBS business failing to transfer mortgage loans to RMBS trusts around 2001. A former analyst of his employer made an off hand comment: "Do you think mortgage security investors would be upset if they found out there were no mortgages in their mortgage-backed securities?" This prompted relator's inquiry about the fledging use of MERS (mortgage electronic recording system) and how mortgage transfers occurred "off the radar" of the county clerks, since no mortgage loan assignments were recorded.

**1.     Department of Justice asked relator to be a "whistleblower"**

7.     Based on information provided by Relator, the Department of Justice ("DOJ") approached Relator in January 2013 and asked him to be a whistleblower against at least 10 investment banks involved in the mortgage and RMBS businesses.  At the time, the DOJ, in the Assistant US Attorney's words, "had nothing on them." HSBC was one of those investment banks.  This case is a follow-on to that whistleblower request.

8.     All of the allegations contained in this Complaint are derived from Relator's direct and independent knowledge of the loans packaged into the HSBC RMBS (or sold directly to Fannie Mae, Freddie Mac, Morgan Stanley or Goldman Sachs (with respect to the last

two, who then included such loans in the MBS sponsored by Morgan Stanley and Goldman Sachs). Defendants intentionally concealed the name and address of each individual borrower and the address of the collateral property. Defendants' fraud was possible only because of their concealment of the names of the borrowers and the addresses of the collateral properties.

9.    Relator's information shows that Defendants knowingly made false statements and claims and/or omitted material information concerning the sale of RMBS and CDOs to the U.S. Government.[2] Defendants' offering documents and related sales materials purportedly summarized and set forth the quality and condition of the borrowers and properties which backed the RMBS and CDO securities. This complaint sets forth ample evidence demonstrating on a loan-level basis the falsity of Defendants' statements regarding the RMBS and CDO securities. Relator's information also reveals Defendants' fraudulently induced purchasers by knowingly including false information regarding the borrowers and collateral properties.

10.    Defendants created and used false records and/or statements in connection with the creation and sale of RMBS and CDOs and presented and/or caused to be presented false or fraudulent claims for payment in connection therewith. Defendants' material omissions (and false statements) regarding their RMBS and CDOs have never been retracted and have endured in form and effect to the present. Thus all financing, guarantees, insurance, and payments associated with Defendants' RMBS and CDOs were made further to and in view of Defendants' false statements.

---

[2] As used herein, "sales of CDOs to the US Government" includes the sale of credit protection by AIG to HSBC on the CDOs and the sales by HSBC to Maiden Lane III of the CDOs for which HSBC purchased credit protection from AIG as described herein.

11.    The evidence Relator presents demonstrates that, in connection with Defendants' RMBS and CDOs, Defendants acted with knowledge and/or reckless disregard for the truth by omitting material information and/or making false statements in the offering documents.[3]

12.    Defendants intentionally concealed the names of the borrowers and the addresses of collateral properties securing the loans so that purchasers, including the United States, could not conduct their own due diligence.  Examination of the underlying loans shows Defendants knew or recklessly disregarded that most of the borrowers were not creditworthy. By concealing the name of a borrower, no one could determine a borrowers' ability to repay their mortgage loan(s).  Instead, purchasers could rely only on Defendants' representations (which led purchasers to believe the borrowers were creditworthy). Furthermore, Defendants represented that the underlying mortgage loans were sound, when they were not. In addition, Defendants claimed the loans complied with specified standards, when they did not.

13.    Relator's information reveals that many of the properties included as collateral in the HSBC RMBS were grossly and recklessly overvalued (by Defendants). Examination of the collateral properties shows that most of them were worth a fraction of the loan amount. In the event of a borrower's default (as it transpired) the collateral properties provided little (and sometimes no security) for the loan. However, Defendants intentionally concealed this information from purchasers.  In addition, they made false

---

[3] As used herein, "with reckless disregard" or "recklessly" means "knowingly, with deliberate ignorance and/or with reckless disregard."

statements in the RMBS and CDO offering documents about the collateral properties' values.

14.    Relator's information on the loans reveals that Defendants fraudulently misrepresented fundamental information necessary for a potential investor to conduct a proper valuation of a mortgage backed security. The process of discovering the loans is an art form onto itself.    To find the borrower and the collateral property, Relator devised a reverse triangulation method. One example of the reverse triangulation is demonstrated by Relator's algorithm for Orange County, Florida (Orlando). Florida imposes an ad valorem document tax on mortgages, so Relator approached the Orange County recorder to see if it was possible to find a document using the amount of the document tax. This was arranged under the recorders system, and Relator would search for mortgages by amount using the amount of the document tax.  Relator would use other data points from the loan tapes to refine the search process (e.g. state, county, date of loan, maturity date, interest rate, zip code of property, etc.) By this process, Relator was able to refine his search results so the resulting pool could be manually reviewed. The process became self-validating, as once the name of the borrower was identified, records were searched for indications the loan was part of the relevant RMBS pool. At this step, foreclosure records in the name of an RMBS trust are an example of self-validation. This is an example of one methodology in one county. There are over 3000 county recorders in the United States, so the potential number of solutions to finding every loan is high, but not insurmountable.

15.    Also, contrary to Defendants' representations in the RMBS offering documents, Relator's information demonstrates that, in most cases, Defendants rarely, if ever,

delivered the original note or an assignment on a timely basis. Without the original note or a valid assignment in recordable form, the HSBC RMBS trusts are unable to foreclose in the event of a default. See for example, Exhibits I, J and K of this complaint.

16. Defendants not only failed to disclose these problems (including, by failing to file updates to any offering documents) but also actively concealed these problems from purchasers, including the U.S Government.

17. The U.S. Government relied on the offering documents when purchasing or otherwise acquiring the RMBS and CDOs. The U.S. Government financed, insured or guaranteed, directly or indirectly, the purchase of Defendants' RMBS and CDOs, including purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, PPIFs, the Maiden Lane Entities, the Federal Home Loan Banks, American International Group, Inc. and Fannie Mae and Freddie Mac (each defined in paragraph 46 below). Each of those Government Purchasers purchased, insured or otherwise acquired billions of dollars of the RMBS and CDOs with funding provided by the U.S. Government, and through direct purchases and guarantees funded by the Federal Reserve System, the central banking system of the United States (the "Federal Reserve") and the U.S. Treasury (the "Treasury"). The U.S. Government has suffered losses as a consequence.

## A. RELATOR'S INFORMATION

18. As mentioned in paragraph 14, Relator independently discovered and reviewed thousands of notes and mortgages backing Defendants' RMBS deals and thousands of documents relating to the underlying borrowers and the properties securing the mortgage notes backing the RMBS deals.

19. Relator also reviewed the loan tapes (which omitted the names of the borrowers and the addresses of the collateral properties) in order to evaluate the veracity of Defendants'

offering documents. Using data on the loan tapes and other methods, Relator uncovered the names of borrowers and addresses of collateral properties and, in the process, uncovered the shoddy lending behind the RMBS securities.

20. Defendants represented to investors that the loans underlying the MBS complied with various guidelines and standards. Defendants publicly stated that: (a) the borrowers were well vetted and creditworthy, (b) Defendants conducted due diligence on the loan portfolios included in its MBS trusts, (c) loans purchased from third party sellers met certain standards, and (d) collateral properties were valued according to independent standards and provided adequate collateral for the loans. Uncovering the names of the borrowers and addresses of collateral properties reveals most (if not all) of these statements were false or misleading.

21. Relator's information also reveals that Defendants included multiple loans from the same borrower (and secured by Units in the same development) in the MBS trusts without disclosing this material fact to investors. Defendants omitted material information regarding the concentration of loans secured by Units in the same development.

22. As a matter of practice, Defendants never provided MBS investors with borrower names or collateral property addresses. In fact, Defendants built safeguards into their MBS marketing system to prevent such information from being given to an inquiring investor.

23. Defendants' MBS salesmen were not given access to the borrower names or property addresses, so even if an MBS investor asked to look at them, the salesman could not provide the information. Omitting borrower names and property addresses from the loan

tapes prevented MBS investors from discovering the borrowers' inability to repay their loans, the overvaluation of properties securing such loans and the undisclosed concentrations of risk in certain borrowers or certain properties (because an RMBS trust contained multiple loans from the same borrower or loans secured by properties in the same development).

24.     Defendants' obfuscation ensured that investors would not be able to conduct their own due diligence on the mortgage loans and make their own judgments about borrowers' ability to repay their loans and the value of properties securing such loans.   This obfuscation also made it impossible for investors to determine if the information Defendants provided in the offering documents was accurate.   The correct and complete information was available to the Defendants but Defendants intentionally concealed this information from potential MBS purchasers.

25.   Relator's information reveals that Defendants used a nominee (MERS) in order further the practice of concealing the names of borrowers and the addresses of collateral properties since the vast majority of mortgage loans originated by HSBC (or purchased by HSBC) and that purportedly served as collateral for the MBS used a nominee.   If the mortgages were recorded in the name of HSBC and the assignments of the mortgages were delivered and recorded as provided in the registration statements, an investor could search the public records and find the loans originated by HSBC and assigned to the applicable HSBC trust.   By recording the mortgages in the name of a nominee, HSBC concealed from investors the loans made by HSBC and owned by a specific HSBC MBS trust.   This allowed HSBC to continue to hide from investors the collateral that was originated by HSBC and the mortgages included in the HSBC MBS trusts.   Defendants'

14

use of the nominee allowed them to keep specific information (for example, HSBC's name and the HSBC MBS trust that owned the mortgage notes) from showing up in the County Clerk indices.  For example, in Kings and Queens Counties in New York, loans made by HSBC Mortgage were routinely recorded as "MERS" loans. This tactic rendered the New York City recorder's indices useless to investors and purchasers for finding loans made to HSBC RMBS trusts when searching for HSBC Mortgage as a lender.

26.     Defendants' omission of property addresses also concealed from investors that the collateral properties were routinely and grossly overvalued.   Relator's information reveals that dozens of properties were used as collateral for $200,000, $300,000 or $400,000+ loans which properties were, in fact, worth a fraction of the loan amount.  The historic and intrinsic property values compiled by Relator evidence how drastically values were inflated.  After default, nearly every property detailed in Exhibits A through H returned to their intrinsic values.  The post-default values are always within range of the pre-inflation values (evidencing that Defendants made loans at hyper-inflated values). Defendants' purported "appraised" values departed radically from historic intrinsic values - often by a factor of 3 or more. The inflated values were not the result of a "run up" of the property market, but of the efforts of Defendants (and other investment banks) to increase the dollar amount and volume of loans so they could issue more and more RMBS securities. (See paragraphs 144 and following of this complaint.)

27.     The combination of omitted information and recording loans via a nominee prevented investors from conducting their own contemporaneous due diligence.  Unable to identify the loans in (or properties securing) an HSBC MBS, investors could not formulate their

own judgments about the ability of borrowers to repay their loans or about the value of the properties securing such loans.

28. Relator's information shows that the Defendants never made timely transfers of loans to its MBS trusts. Had Defendants made timely transfers (known as "assignments" in mortgage circles) of the loans to the MBS trusts on or prior to the closing date as the prospectuses said they would, investors could have determined the composition of loans and collateral in the trust simply by searching public records under the name of the MBS trust. As it were, investors were left in the dark by Defendants' actions.

29. Possession of an original note (or a timely assignment of the mortgage) is critical when foreclosure against a property becomes necessary. In the registration statements for each MBS, Defendants represented for each loan that the original note, mortgage, and an assignment would be delivered to the respective MBS trust on the closing date. Relator's information shows Defendants never delivered the original note (or assignment in recordable form) on a timely basis and, in almost all cases, the original note (or an assignment) was never delivered. Defendants were solely responsible for all failures to assign and/or deliver the original notes and mortgages to the MBS trusts. Without the original note or a valid, timely assignment in recordable form, the HSBC MBS trusts are unable to foreclose in the event of a default, or must incur additional costs to do so, in either case causing damage to investors in the MBS. This factor significantly reduced the value of the collateral to the RMBS.

30. Despite Defendants' knowledge of the significant and serious problems about the MBS trusts' missing transfers of the original notes and assignment of mortgages, Defendants failed to disclose these problems (including, by failing to file updates to the registration

statements) and have actively concealed these problems from purchasers, including the U.S. Government.  (Defendants also breached their representations and warranties by failing to report thousands of defective loans it sold to the MBS trusts.)

31.   Defendants' failure to properly transfer the loans to Defendants' MBS trusts also jeopardized (and continues to jeopardize) their tax-exempt status.  Under Federal tax law, loans must be transferred to an MBS trust within 90 days of the trust's closing.  Exhibits E, F and G list hundreds of assignments to various MBS trusts, almost all occurring much later than 90 days after closing.  All the late loan transfers to Defendants' MBS trusts carry a potential tax penalty of 100% of the amount of the loan.  If the IRS chose to enforce the tax, virtually all of Defendants' MBS would become worthless overnight.

32.   Relator's information reveals that Defendants consistently and repeatedly sold CDOs and MBS to the Government Purchasers (defined below) by knowingly and/or recklessly making false statements and omitting material information regarding the very loans and corresponding collateral that backed the RMBS securities sold.

33.   In addition, Relator's information reveals that Defendants sold defective mortgage loans directly to FHLMC and FNMA (the "GSEs").  The mortgage loans that HSBC sold to the GSEs were originated using inflated values and HSBC made misrepresentations to the GSEs as to the underwriting, origination and quality of such mortgage loans.  In addition, HSBC and its affiliates breached representations and warranties by failing to report thousands of defective loans it sold to the GSEs.  As a result of Defendants' misconduct, Fannie Mae and Freddie Mac sustained massive losses from the purchase of the MBS and the defective mortgage loans and as a result, the U.S. Government placed

Fannie Mae and Freddie Mac into conservatorships, thereby suffering financial injury and loss.

34.   Also, Relator's information reveals that Defendants sold defective mortgage loans directly to Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley") and Goldman Sachs Mortgage Company ("Goldman Sachs").  The mortgage loans that HSBC sold to Morgan Stanley and Goldman Sachs were originated using inflated values and HSBC made misrepresentations to Morgan Stanley and Goldman Sachs as to the underwriting, origination and quality of such mortgage loans.   In addition, HSBC provided a description of HSBC Mortgage or Decision One and its underwriting standards to Morgan Stanley and Goldman Sachs for use in the related prospectus supplement for the third-party MBS sponsored by such entities.  HSBC also knew that their loans were being included in such third-party MBS and that the representations and warranties that HSBC made to Morgan Stanley and Goldman Sachs in the related mortgage loan purchase agreements were going to be assigned by Morgan Stanley and Goldman Sachs to the RMBS trusts sponsored by such entities.  Relator's information shows that HSBC and its affiliates breached representations and warranties by failing to report thousands of defective loans it sold to Morgan Stanley and Goldman Sachs (which were then with HSBC's knowledge then sold to the MS and GS RMBS trusts).   As a result of Defendants' misconduct, the Government Purchasers purchased MS RMBS and GS RMBS that contained loans originated by HSBC and using offering documents containing false statements about HSBC's underwriting standards and the Government Purchasers suffered financial injury and loss.

## II.      PARTIES

### A.      THE PLAINTIFF

35. This action is brought on behalf of the United States of America, its agencies, departments, and entities, including, without limitation, the United States Treasury, the Federal Reserve, and the Government Entities, as set forth and defined below.

### B.      THE RELATOR

36. Relator Joseph C. Amico is a citizen of the United States and resides in the State of New York.

### C.      THE DEFENDANTS

37. Defendants include HSBC Holdings PLC, which is headquartered in London, England, is one of the largest banking and financial services organizations in the world.  HSBC Holdings PLC originated mortgage loans in the United States through its subsidiaries HSBC Mortgage, HSBC Finance and Decision One and created and offered MBS through its subsidiaries, HSBC Bank, Home Equity I, Home Equity II, HSI and HSBC Securities.

38. HSBC Securities is registered as a broker-dealer under the Securities Exchange Act of 1934.  HSBC Securities is a Delaware corporation and has its principal place of business at 452 Fifth Avenue, New York, NY.  HSBC Securities is a direct wholly-owned subsidiary of HSBC Markets (USA) Inc. and an indirect subsidiary of HSBC Holdings plc.  HSBC Securities was the underwriter for each MBS and was the initial purchaser, placement agent and the party who structured and arranged the CDOs and was intimately involved in the offerings of such securities.

39. HSBC Bank is chartered as a national banking association under the laws of the United States with its principal executive office located at 452 Fifth Avenue, New York, New

York.  HSBC Bank is the principal subsidiary of HSBC USA Inc., a New York state-based bank holding company registered under the Bank Holding Company Act of 1956, as amended.  HSBC Bank is an indirect wholly-owned subsidiary of HSBC Holdings plc. HSBC Bank purchased substantially all of the mortgage loans that were included in the MBS and was the sponsor for the MBS.  According to the prospectuses for the MBS, HSBC Bank was responsible for acquiring the mortgage loans to be securitized, negotiating the principal securitization transaction documents and participating with its affiliate HSBC Securities in the structuring of the transactions.

40.    HSI is a Delaware corporation with its principal office at 452 Fifth Avenue, New York, New York 10018.  HSI is a direct wholly-owned subsidiary of HSBC Markets (USA) Inc. and an indirect subsidiary of HSBC Holdings plc. HSI was a depositor for the MBS.

41.    HSBC Mortgage is a Delaware corporation with its principal executive office located at 2929 Walden Avenue, Depew, NY.  HSBC Mortgage is a wholly owned subsidiary of HSBC Bank and an indirect subsidiary of HSBC Holdings plc. HSBC Mortgage originated a substantial number of the mortgage loans which were included in the MBS.

42.    Decision One is a North Carolina limited liability company with its principal executive office located at Edgewater Corporate Center, 3023 HSBC Way, Ft. Mill, South Carolina.  Decision One is an indirect wholly owned subsidiary of HSBC Holdings PLC. Decision One originated a substantial number of the mortgage loans which were included in the MBS.

43.    Home Equity I is a Delaware corporation with its principal office at 2700 Sanders Road, Prospect Heights, Illinois 60070.  Home Equity I is a direct wholly-owned

subsidiary of HSBC Finance Corporation and an indirect subsidiary of HSBC Holdings PLC. Home Equity I was a depositor for the MBS.

44.     Home Equity II is a Delaware corporation with its principal office at 2700 Sanders Road, Prospect Heights, Illinois 60070.  Home Equity II is a direct wholly-owned subsidiary of HSBC Finance Corporation and an indirect subsidiary of HSBC Holdings PLC. Home Equity II was a depositor for the MBS.

45.     HSBC Finance is a Delaware corporation with its principal office at 2700 Sanders Road, Prospect Heights, Illinois 60070.  HSBC Finance is an indirect subsidiary of HSBC Holdings PLC. HSBC Finance was an originator of loans and a sponsor and servicer for the MBS.

46.     As defined above, collectively, these entities are referred to as "HSBC" or "Defendants."

### D.     THE NON-PARTY ORIGINATORS

47.     While defendants HSBC Mortgage and Decision One originated a substantial percentage of the loans included in the MBS, certain of the loans underlying the MBS were acquired by HSBC Bank for each MBS from non-party mortgage originators.  The originators of some the loans underlying the MBS include: Accredited Home Lenders, Inc, American Home Mortgage Corp., Countrywide Home Loans, GreenPoint Mortgage Funding, Inc., SunTrust Mortgage Inc., New Century Mortgage Corporation, Option One Mortgage Corporation, Residential Funding Company, LLC, Wachovia Mortgage Corporation, Wells Fargo Bank, NA and WMC Mortgage Corp.

### E.     THE GOVERNMENT PURCHASERS

48.        The U.S. Government, through purchases, financings, insurance, and guarantees funded by the Federal Reserve and by the U.S. Treasury, directly and indirectly, acquired Defendants' MBS and CDOs.    The U.S. Government includes the following "Government Purchasers":

- "NCUA" means, collectively, the National Credit Union Administration Board (the "NCUA Board"), as Liquidating Agent of U.S. Central Federal Credit Union ("U.S Central"), Western Corporate Federal Credit Union ("Western"), Southwest Corporate Federal Credit Union ("Southwest"), Members United Corporate Federal Credit Union ("Members") and Constitution Corporate Federal Credit Union ("Constitution"), and all other credit unions for which the NCUA Board served as liquidating agent between March 4, 2005 and the date hereof (collectively, the "Failed Credit Unions");
- The Failed Credit Unions;
- "FDIC" means, collectively, the Federal Deposit Insurance Corporation, as receiver for the banks for which the FDIC served as receiver between February 14, 2004 and the date hereof (collectively, the "Failed Banks");
- The Failed Banks, including IndyMac;
- "PBGC" means, collectively, the Pension Benefit Guaranty Corporation, as trustee for the PBGC trusteed-plans terminated between January 1, 2004 and the date hereof (collectively, the "Failed Pension Plans");
- The Failed Pension Plans;
- "Fannie Mae" or "FNMA" means The Federal National Mortgage Association;
- "Freddie Mac" or "FHLMC" means The Federal Home Loan Mortgage Corporation;
- "FHFA" means the Federal Housing Finance Agency, as conservator of Fannie Mae and Freddie Mac;
- "FRBNY" means the Federal Reserve Bank of New York;
- "Federal Home Loan Banks" means the 12 regional federal home loan banks a part of the Federal Home Loan Bank System;
- "PPIFs" means the public-private investment funds that are provided equity and debt financing by the Treasury as part of the Public-Private Investment Partnership ("PPIP") of 2009;
- "Maiden Lane Entities" means Maiden Lane LLC ("ML LLC"), Maiden Lane II LLC ("ML II LLC") and Maiden Lane III LLC ("ML III LLC"); and
- "AIG" means American International Group, Inc., and its subsidiaries (including AIG Financial Products) and affiliates.
- The Failed Credit Unions are listed on Annex C and the Failed Banks are listed on Annex D.

### III.    JURISDICTION AND VENUE

49.        This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, and the FCA, particularly 31 U.S.C. §3732(a), which specifically confers jurisdiction over actions brought pursuant to 31 U.S.C. §3729 and §3730. This Court has personal jurisdiction, as some of the acts proscribed by §3729 as alleged herein occurred in the Eastern District of New York. Furthermore, certain of the Defendants may be found in the District and transact business in this District as set forth herein.

50.        Venue is proper in this district pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a) because several of the Defendants are located in this District, and some of the acts and transactions alleged herein and proscribed by 31 U.S.C. §3729 occurred in this District. Defendants are also subject to personal jurisdiction in this District.

### IV.    CONDITIONS PRECEDENT

51.        Pursuant to 31 U.S.C. § 3729 et seq., this Complaint is to be filed *in camera* and under seal, and is to remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders. Further, the United States Government may elect to intervene and proceed with the action within the sixty day time frame after it receives both the Complaint and the material evidence submitted to it.

52.        This suit is based on Relator's knowledge and experience in the structured finance arena. Relator has direct and independent personal knowledge and is the original source of the information on which the allegations herein are based. The U.S. Government has not made this or a similar case against the Defendants, or to Relator's knowledge was there an open Government investigation targeting Defendants in relation to these claims

before Relator presented his information to the U.S Department of Justice. As mentioned above, when Relator was asked to be a "whistleblower" the US Attorneys office researched and confirmed there were no open investigations at the time (2013). In particular, Relator has mapped the names of borrowers and addresses of properties to the loan numbers set forth in the loan tapes and independently gathered and reviewed thousands of notes and mortgages backing MBS deals, some of which are described herein, and thousands of documents relating to the underlying borrowers and the property securing the mortgage notes backing the MBS deals. Relator's information demonstrates that Defendants have made and used false records and statements, and presented a false claim for payment, against the U.S. Government.

53.     Relator has voluntarily provided all of the material information alleged herein to the Federal Government before filing this action based on said information.

54.     Relator has previously served copy of same upon the United States and, contemporaneously with the filing of this Complaint, has also served the United States with written information setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

55.     Relator has complied with all other conditions precedent to bringing this action.


## V.     FACTS COMMON TO ALL COUNTS

56.     Relator incorporates by reference all preceding paragraphs of the Complaint as if fully set forth herein.

57.     Relator collected thousands of notes and mortgages and thousands of documents relating to the borrowers and properties securing the mortgage notes backing the MBS deals. The documents include notes, mortgages or deeds of trust, assignments,

satisfactions, lis pendens, notices of trustee's sale, foreclosure judgments, foreclosure deeds, trustee deeds, quitclaim and warranty deeds, foreclosure pleadings, civil, criminal and bankruptcy judgments or pleadings, and other documents.

58.     Relator discovered the borrowers' names and collateral property addresses for (i) the HSI Asset Securitization Corporation Trust 2006-WMC1 ("HSI 2006-WMC1"), which closed on or about August 4, 2006; (ii) the HSI Asset Securitization Corporation Trust 2007-NC1 ("HSI 2007-NC1"), which closed on or about June 5, 2007; (iii) the HSI Asset Loan Obligation Trust 2007-1 (" HALO 2007-1"), which closed on or about May 31, 2007, as well as numerous other HSBC MBS trusts. Exhibit A includes a sample of information concerning the borrowers and properties securing the loans comprising the HSI 2006-WMC1 trust. Exhibit B includes a sample of information concerning the borrowers and properties securing the loans comprising the HSI 2007-NC1 trust. Exhibit C includes a sample of information concerning the borrowers and properties that secured the loans that were originated by HSBC Mortgage and sold directly to Fannie Mae and Freddie Mac.  Exhibit D includes a sample of information concerning the borrowers and properties securing the loans comprising the HALO 2007-1 trust. Exhibit E includes a sample of information concerning the borrowers and properties securing loans which HSBC Mortgage made in one condo complex.  Exhibit F includes a sample of information concerning the borrowers and properties securing loans made by Decision One and comprising the HSI 2007-HE1 trust. Exhibit G includes a sample of information concerning the borrowers and properties securing loans made by Decision One and comprising the HSI 2007-HE2 trust.  Exhibit H includes a sample of information concerning the borrowers and properties that secured the loans made by HSBC Mortgage,

25

Decision One and various third party originators and included in several HSBC RMBS trusts. Exhibits I, J and K are collections of faulty assignments from HSI 2006-WMC1, HSI 2007-NC1 and HALO 2007-1, respectively.

## A. MBS BACKGROUND

59.     Defendants originated mortgage loans and also purchased loans from third parties. It then bundled these loans into the MBS it sold to investors. Because Defendants directly originated many of the loans securitized into the HSBC RMBS, Defendants had direct, first-hand knowledge of such loans. They also had material information regarding each borrower and each property underlying each mortgage. Also, HSBC provided warehouse lines to many of the non-party originators that sold loans to HSBC Bank that were included in the MBS. With respect to these financed mortgage loans, Defendants had the opportunity to review the mortgage loans as such non-party originators were originating them and prior to being sold to Defendants' MBS trusts. For all the mortgage loans that Defendants purchased from non-party originators, Defendants had direct, first-hand knowledge of the originators practices. The Defendants also had material information regarding each borrower and each property underlying each mortgage. HSBC had access to the loan files.

60.     Defendants sold their MBS pursuant to registration statements which purportedly described the MBS's terms (the "Registration Statements"[4]). Defendants sold their MBS

---

[4] The MBS were sold pursuant to registration statements, which included prospectuses and prospectus supplements. For a specified HSBC MBS, the associated registration statement (including the prospectus, the related prospective supplement and other documents, including the pooling and servicing agreements, mortgage loan purchase agreements, assignment, assumption and recognition agreements, Mortgage Loan Servicing Rights Purchase and Servicing Agreements, underwriting agreements and loan tapes, if any, filed with the Securities and Exchange Commission) is referred to herein as the "Registration Statement." For all HSBC MBS, collectively, the associated registration statements are referred to herein as the "Registration Statements."

and their CDOs pursuant to offering circulars, pitchbooks and other oral and written materials prepared and delivered to purchasers (together with the Registration Statements, the "Offering Documents").

61.     Defendants are directly responsible for the omissions and misstatements of material fact contained in the Offering Documents because they prepared, signed, filed and/or used these documents to market and sell the MBS, and/or directed and controlled such activities.

62.     MBS securities pay principal and interest much like a regular bond. Payments of interest and principal for MBS securities flow from payments on mortgage loans owned by the MBS trust. In short, borrowers' mortgage loan payments are used to pay principal and interest on MBS securities. The ability of the borrowers to repay their mortgage loans is crucial to a steady cash flow necessary to make payments to MBS investors.

63.     Two primary asset classes back RMBS trusts: the loans and the collateral properties. The loans are dependent on the ability of the Borrowers to repay them. The collateral properties secure performance of the loans; if the Borrower doesn't repay his loan, he loses his property.

64.     In event of a default by a borrower, the value of the property collateralizing a borrower's mortgage loan is crucial to an MBS trust recovering its investment in a loan. In short, a borrower's property guarantees or secures his loan. If a borrower defaults, the MBS trust forecloses the mortgage (or deed of trust), sells the property and gets its money back (assuming the property is worth more than the loan).

**B.     THE HSBC RMBS PROCESS**

65.     Each of the Defendants had a role in the securitization process and the marketing for most or all of the MBS. According to the information provided in the Registration

Statements, this process included (i) originating mortgage loans (through Defendants HSBC Mortgage and Decision One) for the purpose of securitizing them, (ii) HSBC Bank purchasing mortgage loans from third party originators and/or from defendants HSBC Mortgage and Decision One, (iii) structuring and arranging the securitizations, (iv) HSBC Bank selling the mortgage loans to HSI, as depositor, (v) HSI, as depositor, transferring the mortgage loans to the related MBS trust, (vi) issuing the MBS certificates, (vii) underwriting the public offering of the MBS, and (viii) marketing and selling the MBS through HSBC Securities to purchasers such as the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the Federal Home Loan Banks, and Fannie Mae and Freddie Mac.

66.      Defendant HSBC Bank acted as sponsor for the MBS. As sponsor, HSBC Bank acquired mortgage loans from defendants HSBC Mortgage and Decision One, and from third-party originators. HSBC Bank purchased the mortgage loans from the originators (including HSBC Mortgage, Decision One and the third-party originators) pursuant to a Master Mortgage Loan Purchase and Servicing Agreement, or similar agreement. HSBC Bank initiated the securitization of the loans it acquired by transferring the mortgage loans to HSI, as depositor, pursuant to a Mortgage Loan Purchase Agreement, or similar agreement. HSI then transferred such loans to the MBS trust pursuant to a Pooling and Servicing Agreement or similar agreement.

67.      In its capacity as sponsor, HSBC Bank determined the structure of the MBS, purchased the mortgage loans to be securitized and provided data to the credit rating agencies to secure investment grade ratings for the MBS. HSBC Bank selected HSI as the depositor which transferred mortgage loans from HSBC Bank to a MBS trust. HSBC

Bank selected HSBC Securities as the underwriter for the MBS securities. HSBC Bank also selected the servicers of the mortgage loans it purchased and securitized and selected the trustees for the MBS and the custodians for the loan files. In its role as sponsor, HSBC Bank knew and intended the mortgage loans it purchased would be sold in connection with the securitization process.

68.     HSBC Bank conveyed the respective mortgage loans to HSI pursuant to a Mortgage Loan Purchase Agreement, or similar agreement. HSI then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trustee for the benefit of the Certificate holders of the related MBS trusts pursuant to a Pooling and Servicing Agreement or similar agreement. HSBC Bank and HSI were also responsible for preparing and filing the Registration Statements pursuant to which the related MBS were offered for sale.

69.     HSBC Securities was the lead underwriter for all or almost all of the MBS and all of the CDOs. In that role, it was responsible for underwriting and managing the offer and sale of the MBS and the CDOs. HSBC Securities was also obligated to conduct meaningful due diligence to ensure (i) the Registration Statements about the MBS and (ii) the Offering Documents about the CDOs did not contain any material omissions or misstatements, including as to the manner in which the mortgage loans underlying the MBS and the RMBS underlying the CDOs were originated, transferred and underwritten.

70.     HSBC Holdings PLC wholly owns its subsidiaries HSBC Bank (sponsor), HSBC Securities (underwriter), HSBC Mortgage (originator), Decision One (originator) and HSI (depositor). Unlike typical arms-length securitizations, the MBS described herein involved various HSBC Holdings PLC subsidiaries and affiliates at virtually each step in

the chain, from origination of the mortgage loans to the sale of the MBS and CDOs. For all of the MBS, the sponsor was HSBC Bank, the depositor was HSI and the lead underwriter was HSBC Securities.

71.     As the immediate corporate parent of HSBC Securities and HSI, HSBC Markets (USA) Inc., had the power to direct and control the actions of these entities relating to the MBS (and with respect to HSBC Securities the CDOs), and in fact exercised such direction and control over the activities of such entities relating to the purchase of the mortgage loans and the issuance and sale of the MBS and the CDOs. As the immediate corporate parent of HSBC Bank, HSBC USA Inc. had the power to direct and control the actions of this entity relating to the MBS, and in fact exercised such direction and control over the activities of such entity relating to the purchase of the mortgage loans and the issuance and sale of the MBS.

72.     As the corporate parent of HSBC Bank, HSBC Securities, HSBC Mortgage and Decision One, HSBC Holdings PLC had the power to direct and control the actions of these entities relating to the MBS and CDOs, and in fact exercised such direction and control over the activities of such entities relating to the origination and/or purchase of the mortgage loans and the issuance and sale of the MBS and CDOs.

73.     Defendants HSI (the depositor for the MBS), HSBC Bank (the sponsor of the MBS) and HSBC Securities (the underwriter for the MBS) are directly responsible for the omissions and misstatements of material fact contained in the Registration Statements for the MBS because they prepared, signed, filed, supplied information for, and/or used these documents to market and sell the MBS, and/or directed and controlled such activities. Defendant HSBC Securities (the initial purchaser, placement agent and party structuring

30

and arranging the CDOs) is directly responsible for the omissions and misstatements of material fact contained in the Offering Documents for the CDOs because it prepared and/or used these documents to market and sell the CDOs, and/or directed and controlled such activities.

74.     Defendant HSBC Holdings PLC is also responsible for the misstatements and omissions of material fact contained in the Registration Statements and the Offering Documents for the CDOs by virtue of its direction and control over Defendants HSBC Bank, HSBC Securities and HSI.  HSBC Holdings plc also directly participated in and exercised dominion and control over the business operations of Defendants HSBC Bank, HSBC Securities, HSI, HSBC Mortgage and Decision One.

75.     HSBC Holdings PLC, through its subsidiaries was deeply involved in the RMBS market.  HSBC Holdings PLC aggressively originated, purchased and securitized large volumes of mortgage loans and thereby contributed to Defendants' omissions of material facts and to the inclusion of untrue statements of material facts in the Registration and the Offering Documents relating to the RMBS and CDOs.

**C.     THE HSBC CDO PROCESS**

76.     The CDOs are similar in design to MBS, except the collateral for CDOs are MBS securities (and/or other CDO securities).  As with the MBS, the performance of the CDOs is ultimately based on the performance of the mortgage notes and collateral underlying the MBS (or the other CDOs) which a CDO owns.  The CDOs consisted of "mezzanine" CDOs which were backed by the BBB-rated tranches of MBS and "high grade" CDOs

which were backed by single-A and double-AA rated securities.[5] A third type of CDO is a "CDO-Squared" which is a CDO collateralized primarily with securities of other CDOs.

77.     HSBC Securities had an inventory of unsold CDOs which it sold by creating new CDOs which purchased unsold tranches of its older CDOs. HSBC Securities also purchased CDOs in the secondary market to use as collateral for the CDOs. These CDOs are sometimes called "CDO-squared." This scheme sent a false signal to buyers of CDOs that the market for CDOs remained healthy when in fact HSBC Securities' unsellable securities were merely being repackaged and re-rated. HSBC Securities knew the CDOs it was marketing were defective and that their value was impaired from the start. HSBC Securities did not disclose in the Offering Documents the amount of unsold CDO inventory that HSBC owned or the effect HSBC's purchases had on the pricing of the CDO securities sold to purchasers.

78.     HSBC Securities did not disclose to CDO purchasers the low quality of the mortgage assets backing the MBS (and other RMBS) underlying the CDOs. By mid-2005 at the latest, Defendants had institutional knowledge of the poor quality of the mortgage loans that Defendants were using to create the MBS.

**D.     RELATOR'S REVIEW OF THE BORROWERS AND COLLATERAL PROPERTIES REVEALS FRAUD**

79.     Relator compiled Exhibits A through H - wide ranging, nationwide reviews of borrowers and collateral properties. The borrowers and properties summarized in Exhibits A through H reveal that Defendants concealed that (i) the borrowers of the loans

---

[5] Between 2003 and 2006, the lower rated RMBS junior tranches became popular collateral for CDOs because of the higher rates they offered. The higher rates on these BBB rated tranches of the RMBS allowed CDOs collateralized by such assets to themselves offer higher interest rates on the various CDO tranches.

were unlikely to repay their loans and (ii) the properties collateralizing the debts were overvalued and inadequate. In Exhibits A through H Relator reviewed and compiled borrower and collateral property information from more than 40 counties in 8 states, including New York, Massachusetts, Alabama, Arizona and Florida. The data and its compilation, synthesis and presentation is unique and original as to the Defendants.

80.     By way of example: as the Sponsor, HSBC Bank selected HALO 2007-1's pool of approximately 698 conventional, conforming and non-conforming residential mortgage loans secured by first liens on one-to-four family residential properties having an aggregate principal balance as of May 1, 2007 of approximately $325,296,942. HSBC Bank purchased approximately 49.36% of the loans from its affiliate HSBC Mortgage, approximately 4.78% of the loans from its affiliate Decision One, approximately 33.16% of the loans from third party originator American Home Mortgage and approximately 12.7% of the loans from third party originator Greenpoint Mortgage. In each case, such purchase was pursuant to a Master Mortgage Loan Purchase and Service Agreement or similar agreement between HSBC Bank and the respective originator.

81.     HSBC Bank then sold the loans to its affiliate, HSI, as depositor, pursuant to a Mortgage Loan Purchase Agreement dated as of May 31, 2007 between HSBC Bank and MITSC. Pursuant to a Pooling and Servicing Agreement dated as of May 1, 2007, between HSI, as depositor, Citibank, as master servicer and securities administrator, Wells Fargo Bank, N.A. as custodian and securities administrator, and Deutsche Bank National Trust Company, as trustee, the HALO 2007-1 trust was formed. HSI purportedly conveyed the mortgage loans to Wells Fargo Bank, as trustee, for the benefit of certificate-holders of the HALO 2007-1 trust on the closing date. The HALO 2007-1

trust issued approximately $ 325,297,042 of certificates and delivered them to HSI on the Closing Date.[6] HSBC Securities underwrote the certificates and sold them to purchasers (or held them on its books or the books of its affiliates). Each HSBC entity received compensation for their various roles in the transaction.

82.     A photo of each collateral property is included in Exhibits A through H. The photos were obtained from a county assessor's website or Google Maps. Where historical data on a property was needed, Relator looked up the relevant information on the county appraiser's website. Where the county's website was inadequate (*e.g.*, did not go back far enough), Relator reviewed the county clerk's records and/or websites such as Trulia, Zillow or Movato.

83.     Where a borrower had a loan history which could be obtained from public records, a table of each of those loans is included in Exhibits A through H. The table is derived entirely from mortgage loans taken out by the borrower (or his or her spouse/domestic partner).

84.     Certain loans relevant to the HSBC MBS trust are highlighted in the Exhibits. Where a borrower had more than one loan from Defendants, each of the loans from Defendants are highlighted. The table shows the lender/originator in the "Comments" column and also identifies if the loan was a second mortgage loan. Where the Relator was able to identify a HSBC RMBS trust to which a second mortgage loan was sold, the trust is identified in the table.

---

[6] The 8-K filed on June 15, 2007 as part of the Registration Statement for HALO 2007-1 included the Pooling and Servicing Agreement as Exhibit 4.1, the Mortgage Loan Purchase Agreement between HSI and HSBC Bank, as Exhibit 99.1, the Assignment, Assumption and Recognition Agreements with HSBC Mortgage, American Home Mortgage, Greenpoint Mortgage and Decision One as Exhibits 99.2, 99.3, 99.4 and 99.5, respectively.

85.     Every borrower in Exhibits A through H has a table showing the value history of a collateral property associated with the mortgage loan included in the HSBC MBS trust (or sold to FHLMC or FHMA Fannie Mae for Exhibit C). The value history is generally derived from the county assessor's office (or, sometimes, from deeds). The value history table may be short or long depending on a collateral property's history. The "Comments" column in the table describes the grantee of a deed, or originator of a loan, where appropriate. It also states if an amount shown is net (a net number to the HSBC MBS trust assumes a 5% or 6% real estate commission and closing costs).

86.     The Exhibits show the impact to the HSBC MBS trust of its investment in a loan to a borrower. If there is no loss on a loan, it is stated. If there has been a loss on a loan, it is calculated as the amount of any foreclosure judgment less the net recovery from sale of a property. If there is a short sale (which often occurred in lieu of a foreclosure), then the amount of loss or gain on a loan is calculated by deducting net sale proceeds from the loan amount. If a loan is in default or still in foreclosure, then the table states that the HSBC MBS trust has not yet recovered its investment. Where there is a second mortgage, the second mortgage investor, when known, is identified, as well as the impact on it (usually a total loss). The loss number is generally described as a "minimum" as there are often significant costs associated with a foreclosure which are incurred post-judgment and in connection with a property sale.

87.     Occasionally, where Relator recovered relevant information about a borrower, that information is condensed into one or two sentences. In certain cases, a parenthetical is added to give depth to a borrower's circumstances. The Exhibits to this complaint are the product of thousands of hours of experience and required hundreds of hours of work

by the Relator using his special experience, knowledge and expertise. The synthesis and presentation of previously unknown or never before obtained information by Relator is unique and original.

### E.   BORROWERS AND COLLATERAL PROPERTIES

**Exhibit H – Multiple Trusts (Massachusetts)**
**John Arthur - Worcester, MA**

88.      Consider, for example, John Arthur, Borrower #4 of Exhibit H. Arthur resided at 76 Kenwood Avenue, Worcester. Arthur was a 30-35 year-old "clerk" with the Coalition of Ghanians.

89.      Over January 2007 and February 2007, Arthur borrowed over $532,000 through four mortgage loans to finance the purchase of three condos in Worcester.  A few months later Arthur borrowed another $295,000 to purchase a residence at 76 Kenwood Ave. All told, Arthur was carrying about $827,000 of debt by the end of 2007, when he defaulted on his loans.

90.      HSBC gave no indication of Arthur's income as a clerk, but his debt load increased from zero to $827,000 within several months. Arthur's income was apparently inadequate to carry this level of debt, as evidenced by his quick default on all his loans.

91.       One of Arthur's four purchases was a condo, Unit 1 at 139 Cambridge St., Worcester. 139 Cambridge Place was an almost 100-year old single-family house which had been chopped into three small condo Units. Arthur purchased the condo during January 2007, from the condo converter, for $190,000. To finance his purchase, Arthur took out 1st & 2nd mortgage loans via Decision One (an HSBC subsidiary) in the amount of $190,000. HSBC sold Arthur's $158,000 1st mortgage loan to HSI 2007-HE2 as loan #3025.

92.    Arthur defaulted on loan #3025 and was in foreclosure by early 2008. (Arthur defaulted on all of his other outstanding loans, too.) HSI 2007-HE2 foreclosed on Unit 1 and resold it for a net of $19,350 during September 2008. As result, HSI 2007-HE2 lost over $132,000 (87%) on its loan to Arthur. The investor (unidentified) in Arthur's $38,000 2nd mortgage on Unit 1 lost its entire investment. According to HSBC, Unit 1 was appraised at $190,000, or more than nine times the amount recovered.

93.    Arthur's purchase of Unit 1, 139 Cambridge Street appears to be part of larger scheme. Arthur also purchased Units 2 and 3 at 139 Cambridge Street several days after purchasing Unit 1. Arthur financed those purchases with twin $171,000 1st mortgage loans via New Century and First Franklin. (It is unclear from the county record if Arthur actually paid the 10% down on each Unit.) Arthur defaulted on both those loans by 2008, they were foreclosed on, and the Units resold for an average net of $25,500, each during September 2009.

94.    139 Cambridge Street was sold multiple times shortly before its conversion to small condos. As a single family home, 139 Cambridge Street was sold in 1996 for $85,000. It was sold again during 2001 for $145,000, an increase of 71%. It was sold twice again during 2006, first for $310,000 (114% increase) and a month later for $330,000. Shortly, after the last sale (and without apparent improvement) the building was converted to condos, with Arthur purchasing all three Units for an aggregate $573,000 (74% increase). After Arthur's defaults, the three Units (i.e. the whole building) sold for a gross aggregate of about $77,000 or, approximately, the 1996 value of the building.

95.     Unfortunately for investors in HSI 2007-HE2, none of the information about 139 Cambridge Street or Arthur's activities was available or accessible to them because HSBC concealed his name and the address of the collateral property. Omitting and concealing this information made it impossible for investors to assess Arthur's creditworthiness or the relative value of the collateral property.

96.     Defendants' concealment of Arthur's name, property addresses and use of a nominee to record its mortgages prevented anyone attempting a review from discovering the risks.  Defendants induced investors to purchase HSI 2007-HE2 securities by omitting borrower's names and collateral property addresses and dissuaded investors from attempting due diligence by telling them the loan was made according to high standards and vetted.  Defendants' scheme actively denied investors potential access to material information about the loans.

97.     Defendants did not tell potential investors Arthur was grossly over-indebted. With so many loans and little equity in the properties, it was highly likely Arthur would default and HSI 2007-HE2 would suffer losses.  Defendants also failed to disclose that the property Arthur posted as collateral was over-valued; its intrinsic value is demonstrated by reversion to a historically consistent value after foreclosure.

**Christopher Chasse - Hyde Park, MA**

98.     Consider, for example, Chris Chasse, Borrower #12 of Exhibit H. Chasse resided at 114 Brian Road, Somerset, MA. Chasse was a 35 year-old with no visible employment history.

99.     During 13 months from February 2006 to March 2007, Chasse took out 15 loans totaling almost $4 million to finance purchases of at least 9 condo Units in old, converted

Boston rooming houses and 2 other properties. All told, Chasse was carrying over $3,953,250 of debt by the end of 2007, when he defaulted on all his loans.

100.     HSBC indicated Chasse's income was about $6000 per month (although he had no visible employment), which apparently was inadequate to carry over $3.9 million of debt.

101.     One of Chasse's dozen properties was a modest condo Unit (#103) in a 105-year old former rooming house at 10-12 Ellis Street, Hyde Park, MA. Chasse purchased the Unit during July 2006, for $360,000 from Tritto. To finance his purchase, Chasse took out 1st & 2nd mortgage loans via WMC in the total amount of $360,000 (100% financing). HSBC purchased Chasse's 1st mortgage loan from WMC and resold it to HSI 2006-HE1 as loan #11605578.

102.     Chasse defaulted on loan #11605578 and was in foreclosure by late 2007. After foreclosure, Unit 103 was resold on the open market during 2009 for $62,310, net. As a result, HSI 2006-HE1 lost over $225,600 (78%) on its loan to Chasse. According to HSBC, Unit 103 was appraised at $360,000 in 2006, or 5.7 times the amount recovered after selling it in 2009.

103.     10-12 Ellis Street was sold multiple times shortly before its conversion to small condos. As a low-end rental, 10-12 Ellis was sold in 2000 for $562,000. It was sold again during 2002 for $800,000, an increase of 42%. It was sold twice again during 2003 and 2005, for approximately $1,100,000 each time (39% increase). Shortly, after the last sale in 2005 (and without apparent improvement) the building was converted to six condo Units. Unit 103 was sold to Tritto for $360,000 (97% pro rata increase), valuing the building at $2.16 million. After 6 months, Tritto resold Unit 103 to Chasse for the same

$360,000 price, and then Chasse defaulted during 2007. The market resale of Unit 103 for $62,310, net, represents (pro rata) the approximate value of the building during the year 2000.

104.     Chasse's purchase of Unit 103, 10-12 Ellis St appears to be part of larger scheme. Chasse also purchased a second unit at 10-12 Ellis St and two units 28 Stellman Road, along with five other condo units in converted houses. He also purchased a home in Foxboro, MA and another house in Webster, MA. Chasse did not have the income to support $3.9 million of debt and defaulted on all his loans during 2007. During 2010, Chasse was arrested by local police for selling counterfeit Patriots' NFL tickets. The local police confiscated his laptop and his mortgage activity was discovered. He was later convicted of mortgage fraud.

105.     Unfortunately for investors in HSI 2006-HE1, none of the information about Chasse's activities was available or accessible to them because HSBC concealed his name and the address of the collateral property. Omitting and concealing this information made it impossible for investors to assess Chasse's creditworthiness or the relative value of the collateral property.

106.     Defendants' concealment of Chasse's name, property addresses and use of a nominee to record its mortgages prevented anyone attempting a review from discovering the risks. Defendants induced investors to purchase HSI 2006-HE1 securities by omitting borrower's names and collateral property addresses and dissuaded investors from attempting due diligence by telling them the loan was made according to high standards and vetted. Defendants' scheme actively denied investors potential access to material information about the loans.

107.     Defendants did not tell potential investors Chasse was grossly over-indebted. With so many loans and little equity in the properties, it was highly likely Chasse would default and HSI 2006-HE1 would suffer losses.  Defendants also failed to disclose that the property Chasse posted as collateral was over-valued; its intrinsic value is demonstrated by reversion to a historically consistent value after foreclosure.

**Grande Oasis Condo - Exhibit E**

108.     Consider, for example, Exhibit E, a survey of 46 condo units financed by HSBC Mortgage. Exhibit E surveys the 69 loans (1st & 2nd mortgage) HSBC made against 46 condo units in a condominium conversion at North Himes Avenue, Tampa, FL.

109.     Between September 2006 and September 2007, HSBC made 67 loans to purchasers in the condo conversion and made two more loans to refinance existing owners. To date, all of the loans, except maybe one, have defaulted, leading to significant losses.

110.     HSBC lent a total of $8,940,300 against condo units at the Grande Oasis. As of January 2016, the losses to investors from HSBC's loans at Grande Oasis total at least $7,234,564, with the amount expected to grow (several units are still in foreclosure).

111.     HSBC made multiple loans to several buyers of condos at Grande Oasis. For example, one person, Simcha Deutsche, purchased 19 condos around the same time, 9 of which were financed by HSBC **on the same day** (May 7, 2007). All of Deutsche's loans defaulted. Another example were members of the Damas family (Jorge, Leonides, Pablo). The Damas' purchased 18 condo units at Grande Oasis, 10 of which were financed by HSBC. All of the Damas' loans defaulted. Another example was Jose & Mercedes Aller. The Allers bought only 5 units at the Grande Oasis Condo, 4 of which were financed by HSBC, all within the same week. All the Allers' loans defaulted.

112.     HSBC spread the loans it made against Grande Oasis Condos around the financial system. Some loans were sold to FNMA and FHLMC. Some loans were sold to Goldman Sachs, who put them in their RMBS (e.g. GSAA 2007-2). Some loans were sold to other investors. Some loans were put into HSBC RMBS securities.

113.     For example, a couple of the Damas' loans were sold to HALO 2007-1. HSBC sold two $212,750 loans (one each to Jorge & Pablo) to HALO 2007-1. The loans were secured by Grande Oasis condo Units 1615 and 2824. Both loans defaulted, both units were foreclosed and bought by the condo association for unpaid dues, with both loans resulting in 100% losses to HALO 2007-1.

114.     Unfortunately for investors in HALO 2007-1, none of the information about the Damas' activities were available or accessible to them because HSBC concealed their name and the address of the collateral properties. Omitting and concealing this information made it impossible for investors to assess the Damas' creditworthiness or the relative value of the collateral properties.

115.     Defendants' concealment of the Damas' names, property addresses and use of a nominee to record its mortgages prevented anyone attempting a review from discovering the risks. Defendants induced investors to purchase HALO 2007-1 securities by omitting borrower's names and collateral property addresses and dissuaded investors from attempting due diligence by telling them the loan was made according to high standards and vetted. Defendants' scheme actively denied investors potential access to material information about the loans.

116.     Defendants did not tell potential investors the Damas' were grossly over-indebted. With so many loans and little equity in the properties, it was highly likely the

Damas' would default and HALO 2007-1 would suffer losses.  Defendants also failed to disclose that the properties Damas' posted as collateral were over-valued; their intrinsic values demonstrated by reversion to historically consistent values after foreclosure.

**HALO 2007-1 - Exhibit D**
**Edmon & Ann Motes - Gulf Shores, Alabama**

117.  Consider, for example, Edmon & Ann Motes - borrower #21 of Exhibit D. The Motes' resided at 4901 Millhouse Rd, Gulf Shores, Alabama. The Motes took out at least 24 loans during four years totaling $14,218,357. Motes was an aspiring home builder and accumulated a number of building lots with the idea of one day building homes. Motes would often transfer lots and homes between himself, his construction company and another controlled company, increasing the price and cashing out via a larger loan.

118.  One home Motes apparently did build was his own, at 4901 Millhouse Road, Gulf Shores, Alabama. Motes purchased the lot in October, 2003 for $44,900. With $260,000 bank financing during March 2004, Motes cashed out his costs and constructed a home. He then refinanced in December 2004 for $400,000, cashing out another $140,000.  About 6 months later, he took out a $180,000 2nd mortgage on the home, cashing out another $180,000. In February 2007, HSBC refinanced Motes' existing $580,000 debt on his home, lending him $787,000 (and allowing Motes to cash out another $207,000). At the time (February 2007) HSBC appraised the property at $1,250,000 - an increase of nearly five times what the property was worth in March of 2004. Motes' 1st mortgage loan of $787,000 was sold by HSBC to HALO 2007-1 as loan #829860266. Motes defaulted on his loan during 2008, it was foreclosed and the property taken by HALO 2007-1. During 2010, HALO 2007-1 resold the property on the open market for about $341,000, net. HALO 2007-1 lost over $445,000 on its 1st mortgage on

Motes' property. HSBC's appraisal of Motes home ($1.25 million) was more than 3.5 times the amount HALO 2007-1 recovered when it sold the property.

119.     HSBC continued to lend money to Motes, too. In May of 2007, HSBC lent Motes another $300,000 against a property at 8471 Forest Drive, Foley, Alabama. Motes purchased 8471 Forest Drive for $135,000 a mere three weeks prior to the HSBC loan. Through the HSBC loan, Motes was able to cash out $165,000 against 8471 Forest Drive. HSBC sold Motes' $300,000 loan to FHLMC. Motes defaulted on the loan, FHLMC foreclosed and resold the property in November 2009 for $198,000 net. FHLMC lost over $100,000 on the loan.

120.     Unfortunately for investors in HALO 2007-1, none of the information about Motes' activities was available or accessible to them because HSBC concealed his name and the address of the collateral property. Omitting and concealing this information made it impossible for investors to assess Motes' creditworthiness or the relative value of the collateral property.

121.     Defendants' concealment of Motes' name, collateral property address and use of a nominee to record its mortgages prevented anyone attempting a review from discovering the risks. Defendants induced investors to purchase HALO 2007-1 securities by omitting the borrowers' names and collateral properties' addresses and dissuaded investors from attempting due diligence by telling them the loan pool was made according to high standards and vetted. Defendants' scheme actively denied investors potential access to material information about the loan pool. The misrepresentations on the FHLMC loan are fairly self-evident.

122.     Defendants omitted informing potential investors that Motes was grossly over-indebted, one property was not his residence and their values inflated. With so many loans, it was highly likely Motes would default and HALO 2007-1 would suffer losses. Defendants also concealed that they had dropped underwriting standards so low, that even with Motes' over-indebtedness, they were willing represent to investors these were a sound loans. Defendants also failed to disclose that the property Motes posted as collateral was grossly over-valued; its true values demonstrated by reversion to a historically consistent value after foreclosure.

**Joseph & Mary (aka Cathy B) Yarborough - Gulf Shores, Alabama**

123.     Consider, for example, Joseph & Mary Yarborough - borrower #28 of Exhibit D. The Yarboroughs reside in Gulf Shores, Alabama. Yarborough was in the construction business, attempting to build homes. Unable to sell homes after January, 2005, the Yarboroughs often transferred lots and homes between themselves, his property company, and related entities/persons, increasing the price and cashing out via a larger loan. Between January 2005 and January 2008, Yarborough took out 43 loans totaling $13,243,092.

124.     HSBC accommodated Yarborough's cash-out scheme during four months at the end of 2006, giving him 14 loans totaling $3,784,000 against seven properties. Each property Yarborough financed with HSBC was transferred between Yarborough and a related entity. All 14 of the loans defaulted. HSBC sold two of the 1st mortgage loans to HALO 2007-1. HSBC also sold two of the 1st mortgage loans to FHLMC. HSBC sold the remaining three 1st mortgage loans to unidentified RMBS trusts or investors. All seven 2nd mortgage loans were sold to unidentified investors (each leading to a 100% loss of investment).

125.     Yarborough borrowed $325,000 from HSBC against 22732 Inverness Way, Foley, AL. Yarborough cashed out $99,000 in this refinancing. HSBC sold the 1st mortgage loan to FHLMC, who foreclosed when Yarborough defaulted. FHLMC resold the property during 2008 for about $161,000, net. FHLMC lost about $84,000 on the 1st mortgage loan, and the 2nd mortgage investor lost its entire $80,000 investment.

126.     Yarborough borrowed $351,000 from HSBC against 22500 Inverness Way, Foley, AL. Yarborough cashed out $59,000 in this refinancing. HSBC sold the 1st mortgage loan to FHLMC, who foreclosed when Yarborough defaulted. FHLMC resold the property during 2008 for about $181,000, net. FHLMC lost about $121,000 on the 1st mortgage loan, and the 2nd mortgage investor lost its entire $49,000 investment.

127.     Yarborough borrowed $940,000 from HSBC against 3613 Olde Park Road, Gulf Shores, AL. Yarborough cashed out $100,000 in this refinancing. HSBC sold the $840,000 1st mortgage loan  to HALO 2007-1 as loan #829637664.   Yarborough defaulted, HALO 2007-1 foreclosed with a deficit of $863,805 and resold the property on the open market during 2010, netting about $371,000. As result, HALO 2007-1 lost over $492,000 (59%) on its loan to  Yarborough. The 2nd mortgage investor lost its entire $100,000 investment. According to HSBC, the property was appraised at $1,200,000 in 2006, or about 3.2 times the amount recovered in 2010.

128.     Yarborough borrowed $1,050,000 from HSBC against 3637 Olde Park Road, Gulf Shores, AL. Yarborough cashed out $210,000 in this refinancing. HSBC sold the $850,000 1st mortgage loan  to HALO 2007-1 as loan #829705457.   Yarborough defaulted, HALO 2007-1 foreclosed with a deficit of $871,713 and resold the property on the open market during 2008, netting about $621,000. As result, HALO 2007-1 lost over

$250,000 (23%) on its loan to Yarborough. The 2nd mortgage investor lost its entire $200,000 investment. According to HSBC, the property was appraised at $1,325,000 in 2006, or about $700,000 more than the amount recovered in 2008.

129.     Two of the remaining three HSBC loans to Yarborough were sold to unidentified RMBS trusts. Both loans defaulted. HSBC made a $307,500 1st mortgage loan (and a $20,500 2nd mortgage) against 22420 Inverness Way. After foreclosure, the property was resold for about $147,000 net, leading to a $160,500 loss (52%) for the unidentified RMBS trust. HSBC also made a $300,000 1st mortgage loan (and a $28,000 2nd mortgage) against 22535 Inverness Way. After foreclosure, the property was resold for about $201,000 net, leading to a $99,000 loss for the unidentified RMBS trust. (Both of these properties had been refinanced by Yarborough three or four times in the previous year.)

130.     The last of HSBC's loans to Yarborough were a $362,000 1st mortgage and $100,000 2nd mortgage against 22505 Inverness Way. After default the property was resold by HSBC, on behalf of an unidentified investor (likely FNMA or FHLMC) for about $184,000 net. This led to a $178,000 loss (49%) for the 1st mortgage investor and a $100,000 loss for the second mortgage investor. Yarborough refinanced this property four times in the previous year, too.

131.     Unfortunately for investors in HALO 2007-1, none of the information about Yarborough's activities was available or accessible to them because HSBC concealed his name and the address of the collateral property. Omitting and concealing this information made it impossible for investors to assess Yarborough's creditworthiness or the relative value of the collateral property.

132.     Defendants' concealment of Yarborough's name, collateral property address and use of a nominee to record its mortgages prevented anyone attempting a review from discovering the risks. Defendants induced investors to purchase HALO 2007-1 securities by omitting the borrowers' names and collateral properties' addresses and dissuaded investors from attempting due diligence by telling them the loan pool was made according to high standards and vetted. Defendants' scheme actively denied investors potential access to material information about the loan pool. The misrepresentations on the FHLMC loans are fairly self-evident.

133.     Defendants concealed from potential investors that the Yarboroughs were over-indebted and the properties' values inflated. With multiple loans, it was highly likely Yarborough would default and HALO 2007-1 would suffer losses. Defendants also concealed that they had dropped underwriting standards so low, that even with Yarborough's over-indebtedness, they were willing represent to investors these were a sound loans. Defendants also failed to disclose that the properties Yarborough posted as collateral were grossly over-valued; their true value demonstrated by reversion to historically consistent values after foreclosure.

**Loans to FNMA / FHLMC - Exhibit C**

134.     Exhibit C focuses on loans originated by HSBC (through HSBC Mortgage and Decision One) and sold to FHLMC or FNMA. Exhibit C is a survey of 100 loans randomly sampled by the Relator. To avoid confusion, Relator limited the survey primarily to loans where FNMA or FHLMC took title to the foreclosed property. Relator saw a large number of defaulted loans which appeared to have been sold to FHLMC or FNMA. But, as the servicers often foreclosed in their name and resold the property, there is the possibility the loan was sold to someone other than FHLMC or FNMA. Therefore,

48

Relator did not include more than a couple of such loans in the survey. The survey shows HSBC's underwriting standards for loans it sold to FHLMC or FNMA were as bad or worse than for loans it sold to its MBS trusts.

**Dario Gomez, Jesus Agudelo, et al - Naples, FL**

135.     Consider, for example, Dario Gomez and Jesus Agudelo - borrower #68 of Exhibit C. Gomez and Aguedelo were brothers-in-law. Their wives were part of the borrowings, too, taking loans in their names. Collectively, the four individuals are referred to as "Gomez".

136.     Between January 2001 and July 2007, Gomez borrowed a total of $5,083,584, taking out 30 mortgage loans in the process. Gomez eventually acquired at least eight properties. They refinanced the properties frequently over the time period, cashing out nearly $1.3 million in the process. They defaulted on their outstanding loan by 2008.

137.     One property Gomez acquired was 5066 24th Avenue SW, Naples, FL. Gomez purchased the property for a nominal $550,000, with $412,500 financed by HSBC. (From the county record it is unclear if Gomez actually paid the balance.) The property is a modest single story building with a couple of small rental units. The only prior record was a 1990 sale of the lot (at less than $25,000). Using a standard 3x lot value as improved value, the property was likely worth no more than $75,000 when built out. When sold to Gomez in December 2005, it was unlikely worth $550,000 (a 633% inflation of value). Gomez's 1st mortgage loan of $412,500 was sold by HSBC to FHLMC. Gomez defaulted and FHLMC foreclosed with a judgment deficit of at least $473,701. FHLMC resold the property during 2011 for $142,750, net. Gomez's loan resulted in a loss to FHLMC in excess of $330,000 (80%).

138.     Defendants omitted informing FHLMC that Gomez was grossly over-indebted, the property was not his residence and the value inflated. With so many loans, it was highly likely Gomez would default and FHLMC would suffer losses. Defendants also concealed that they had dropped underwriting standards so low, that even with Gomez's over-indebtedness, they were willing represent to FHLMC it was a sound loan. Defendants also failed to disclose that the property Gomez posted as collateral was grossly over-valued; its true value demonstrated by reversion to a historically consistent value after foreclosure.

## 1.    It's All About "Profit"

139.     Relators' exhibits demonstrate the Defendant's complete disregard of underwriting standards in pursuit of apparent profit. How did the Defendants "profit" from carving up the cash flows from the mortgage loans? Conceptually, the answer may be broken down into three general frames of reference: (1) timing, (2) credit quality, and (3) volume.

140.     For example, most of the loans in HSI 2007-NC1 were 30-year loans. Given that the average American stays in their own home about seven years, it is foreseeable most of the loans in the pool will not run 30 years. Under normal circumstances, most loans in the pool would pay off after 5 to 10 years because of either a sale or refinancing. Nearly all RMBS securities assume this timing issue as a fact. (This is known in the industry as the "prepayment speed assumption".) And, nearly all RMBS securities carry less than 30-year terms since experience has shown (with varying degrees of accuracy) a lot of loans are paid off early. If, for example, a sponsor were able to predict that 20% of $1 billion pool of loans would be paid off in less than 5 years, then a sponsor would issue $200

million of 5-year securities (with a lower interest rate), rather than a 30 year security. If the pool's 30-year loans carried an average 6% interest rate and a 5-year "AAA" RMBS security required a 3% interest rate to sell, then a sponsor of the RMBS could "profit" by carving up the loans into a 5-year slice and an "everything else" slice. On the 5-year slice of $200 million the sponsor's "profit" might, on average, be the difference between 3% and 6% (3%) per year times 5 years times the $200 million. (Under these assumptions the sponsor's "profit" would be $30 million.) A sponsor would profit more if its carving were more efficient: for example, by carving the cash flows into 2-year, 3-year, 5-year, 7-year, 10-year, 15-year and "everything else" slices. This carving of the timing is standard in the industry. Some banks, such as HSBC, used interest rate swaps and caps to pull out cash flow from their RMBS trusts, thereby avoiding disclosing profit margins.

141.    A second way a sponsor profited from creating RMBS securities was by carving up the credit quality of the loan pool. Some loans in a pool might be of good credit quality, some not so good. A sponsor might carve up the credit quality of a pool by issuing one slice which would bear the first 5% of credit losses (defaults, bankruptcies, etc.) on a pool wide basis and a second slice (95% of the pool) which would suffer losses only after the 5% loss pool was depleted. The 5% "first loss" (or subordinated) slice would be sold at a high interest rate (say 30%) to compensate for the projected losses. If, over the average life of loans in the pool (say 10 years), the total losses were estimated to be only 3%, then the "first loss" slice might yield up to 18% after taking into account the credit losses. And the 95% "everything else" slice would never have a loss. If this were the case, the 95% slice could be considered "AAA" and could be sold at a low interest rate - say 4% for a 10 year term. If the loans in a pool had an average 7% interest rate, a

sponsor could profit from creating "first loss" and "everything else" slices since it would make 3% "profit" on the everything slice (which likely decreases ratably over the 10 years). If a sponsor created a $1 billion pool, its profit on carving up the credit might total $100 million ($150 million surplus on a $950 million "everything else" slice over 10 years, less $50 million extra interest on a $50 million "first loss" slice).

142.     A third way a sponsor profits from creating RMBS securities is volume. The greater the size of a pool or number of pools, the greater the "profit". The defendants increased their "profit" by increasing the number of loans, the size of the loans and the number of RMBS securities. Defendants increased the number of loans by incentives to both borrowers and loan originators. Incentives to borrowers included "teaser rates" and higher loan amounts. Teaser rates often took the form of a low interest rate for one, two or even three years. After then, the rate would shoot up. Defendants encouraged borrowers to take more loans by refinancing before the "teaser" period expired. Defendants also encouraged borrowers to take out more loans by offering to lend more against a property (i.e. inflating the appraised value for a refinance). These incentives led to borrowers refinancing a single property frequently - many times after only a year or so.

143.     Defendants also increased the number of loans by offering incentives to its correspondent loan originators. The incentives could take several forms, including cash premiums and financing. Defendants offered cash incentives to loan originators by buying loans from them for greater than their fair value. For example, an originator would be offered an incentive of 102% if it generated in excess of $10 million of loans per month. In such an example, Defendants would pay an originator $200,000 more than the $10 million face value of newly made loans. Incentives of this type encouraged

52

originators to make speculative loans and inflate values to get over the thresholds and get free money.

144.     Defendants also encouraged more loans by offering their correspondent loan originators revolving "warehouse" lines with incentives. (Originators used warehouse credit lines to fund loans and then repaid them when the loans were sold. The Defendants effectively controlled an originator by controlling its credit lines.) If an originator, for example, produced more than $50 or $100 million of loans per month, such incentives might take the form of less stringent loan reviews, more favorable interest rates, or more favorable rollover periods (or all these and more). Incentives of this type encouraged originators, too, to make speculative loans and inflate values to get over the thresholds and get more money.

145.     These and similar incentives offered by Defendants encouraged inflation of values, simply because it is easier get to a $1 billion pool if the loans average about $500,000 each (2,000 loans) than if they average about $100,000 each (10,000 loans). Defendants, desiring to make more "profit," pushed the limits to their breaking point.

146.     Defendants also made and used incentives to encourage origination of speculative loans. An RMBS sponsor could "profit" from carving up the credit (see above) on 7% loans, and they could make an even greater profit by carving up the credit on 12% loans. Defendants convinced investors that by carving up the credit of 12%+ loans, there wasn't any greater risk for certain securities. As Relator's information shows, this was grossly misleading.

## F.    DEFENDANTS FAILED TO APPROPRIATELY TRANSFER LOANS TO THE MBS TRUSTS

147.     Relator reviewed in excess of 195 loans included in the loan pool for HSI 2006-WMC1 to determine if Defendants properly transferred the loans in accordance with the terms of the Pooling and Servicing Agreement and the disclosures set forth in the Registration Statement.  Exhibit I includes a sample of assignments of the loans in HSI 2006-WMC1.  Relator also reviewed in excess of 195 loans included in the loan pool for HSI 2007-NC1 to determine if the loans were timely transferred to that trust.  Exhibit J includes assignments of loans in HSI 2007-WMC1.  Relator also reviewed in excess of 50 loans included in the loan pool for HALO 2007-1 to determine if the loans were timely transferred to that trust.  Exhibit K includes assignments of loans in HALO 2007-1.

148.     Relator's review shows Defendants failed to timely assign or deliver a single loan to the HSI 2006-WMC1 trust as of the closing date or within 90 days of the closing date.[7] Relator's review of loans from HSI 2007-NC1 shows an identical result – HSBC did not

---

[7] According to the prospectus' for the HSBC MBS trusts, in order for the HSBC MBS trusts to qualify for tax free status as a "real estate mortgage investment conduit" or "REMIC" under the U.S. Internal Revenue Code, the loans must be transferred to the REMIC trust on the "Startup Day," or at most as of the close of the third calendar month beginning after the "Startup Day". The "Startup Day" is stated to be the date of issuance of the REMIC Securities or the closing date. The prospectus supplements represent that "assuming compliance with all provisions of the pooling and servicing agreement" each REMIC established under the pooling and servicing agreement will qualify as a REMIC which implies that all assignments of the mortgage loans would be completed by 90 days after the closing date.

The prospectus supplements state that on or prior to the Closing Date, the Depositor will deliver to the Custodian the entire "mortgage file" for each Mortgage Loan, including the original note with all intervening assignments and the original mortgage with evidence of recording and all assignments of the mortgage and note. The prospectus supplements also represent that the Custodian will, for the benefit of the holders of the Certificates, review each mortgage file within ninety days after the Closing Date and confirm that each of the loan documents is in its possession and is property endorsed as provided in the pooling and servicing agreement. These representations were false and misleading and made by the Defendants with reckless disregard for their truth. As described below, Defendants knew that as of the closing date of the MBS transactions that they would and did not deliver valid assignments or the original notes to the related MBS trust on a timely basis as represented in the Registration Statements because it was Defendants' practice to not do so.

transfer a single loan on a timely basis. Relator's review of loans from HALO 2007-1 also shows an identical result – HSBC did not transfer a single loan on a timely basis.

149.     Without delivery of the original mortgage notes or an effective, timely assignment of the mortgage notes, the securities issued by the HSBC RMBS trusts were not mortgage backed securities, but essentially unsecured debt.[8]

150.     The prospectus supplements for each HSBC RMBS trust stated that the trust would hold good title to the mortgage loans and related documents, including the original mortgage note (including all intervening endorsements showing a complete chain of endorsements), the related original mortgage with evidence or recording and the mortgage assignments. For example, the prospectus supplement for HSI 2007-NC1 provides:[9]

> In connection with the transfer and assignment of each Mortgage Loan to the Trust, the Depositor will cause to be delivered to the Custodian, on behalf of the Trustee, on or before the Closing Date, the following documents with respect to each Mortgage Loan which constitute the mortgage file:
>
> (a) the original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the Mortgage Loan Seller to the last endorsee; . . .
>
> (c) the related original mortgage and evidence of its recording or, in certain limited circumstances, a copy of the mortgage certified by the Mortgage Loan Seller, escrow agent, title insurer, or closing attorney; . . .
>
> (e) the mortgage assignment(s), or in certain limited circumstances, an officer's certificate of the Mortgage Loan Seller, escrow agent,

---

[8] *Fed Home Lon Bank of Chicago v. Bank of America Funding Corp.*, No. 10CH45033, 2012 WL 4364410 (Ill. Cir. Ct. Cook County Sept. 19, 2012) ("Defendants' claim that the Offering Documents never said that the notes would be validly transferred insinuates that Defendants wish this Court to believe that purchasers bought securities knowing that the underlying assets could not be enforced.").

[9] The prospectus supplements for all of the other HSBC RMBS trusts have identical or nearly identical language.

title insurer, or closing attorney, showing a complete chain of ownership from the Mortgage Loan Seller to the last assignee;

(f) a mortgage assignment in recordable form, with the assignee's name left blank;

151.     The base prospectuses for each of the HSBC RMBS also provided that:

2.     If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System.

152.     None of the prospectus supplements for the HSI 2006-WMC1, HSI 2007-NC1 or HALO 2007-1 trusts (or any of the other HSBC RMBS trusts) provides that assignments of the mortgage loans will be registered through Mortgage Electronic Registration Systems, Inc. (MERS).  Based on the language from the base prospectuses and the fact that none of the prospectus supplements provided that any of the mortgage loans would be registered through the MERS system, the Offering Documents effectively provide that none of the mortgage loans would be registered through the MERS system.  As set forth herein, Relator's information demonstrates that this disclosure was false and materially misleading.

153.     In any event, even if the prospectus supplements did specify that the mortgage loans were registered through the MERS System (which they did not) and had an exception for delivering and recording assignments of mortgages for mortgage loans registered through the MERS System, this exception would not excuse the Defendants from delivering the original notes to the trustee of the applicable HSBC MBS trust on or prior to the closing date.

## VI.   DEFENDANTS' USE OF FALSE RECORDS AND/OR STATEMENTS

154.      Plaintiff hereby incorporates by reference in this Complaint (i) every Registration

Statement (including any prospectus supplement) for every MBS issued and (ii) every

Offering Document relating to every CDO.

### A.   DEFENDANTS USE OF REGISTRATION STATEMENTS AND OFFERING DOCUMENTS TO FURTHER THEIR SCHEME

155.      Defendants made representations and warranties about the mortgage loans in the

Offering Documents.  By way of example, the prospectus supplement for HSI 2007-NC1

represents that HSBC Bank will make certain representations and warranties in the

Mortgage Loan Purchase Agreement with respect to each Mortgage Loan:

> Pursuant to the Mortgage Loan Purchase Agreement, the Sponsor [HSBC Bank] will make certain representations and warranties with respect to each Mortgage Loan which representations and warranties will be assigned by the Sponsor to the Trustee on behalf of the Trust. These representations and warranties generally include the following:
>
> > (6) Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, predatory and abusive lending, consumer credit protection, equal credit opportunity, fair housing or disclosure laws applicable to the origination and servicing of mortgage loans of a type similar to the Mortgage Loans to be transferred to the Trust have been complied with; . . .
>
> > (11) **The Mortgage Loan was originated or acquired by the Mortgage Loan Seller and if acquired, underwritten in all material respects with the Originator's underwriting guidelines;** . . .
>
> > (16) The mortgage file contains an appraisal of the related Mortgaged Property signed by a qualified appraiser who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security of the Mortgaged Property, whose compensation is not affected by the approval or disapproval of the Mortgage Loan and

who met the minimum qualifications of Fannie Mae and
Freddie Mac. . . .

156.     The Offering Documents for each of the other MBS contain similar

representations.  For example, the prospectus supplement for HSI 2006-WMC1 states

that pursuant to the Mortgage Loan Purchase Agreement between HSBC Bank and HSI,

HSBC Bank will make certain representations and warranties regarding the Mortgage

Loans, which the depositor will assign to the trustee for the benefit of the certificate-

holders.  Among the representations and warranties that HSBC Bank made in the

Mortgage Loan Purchase Agreement for HSI 2006-WMC1 with respect to each Mortgage

Loan included:

> The Seller [HSBC Bank] hereby represents and warrants to the
> Company [HSI] with respect to each Mortgage Loan as of the date
> hereof and as of the Closing Date as follows:
>
> With respect to each Mortgage Loan, as of the date hereof and as of the Closing
> Date:
>
> (1)     The Seller has good title to the Mortgage Loans and the Mortgage Loans
> were subject to no offsets, defenses or counterclaims.
>
> (2)     **The information set forth in the Mortgage Loan Schedule is complete,
> true and correct as of the Cut-off Date. . . .**
>
> (8)     The Mortgage is a valid, existing and enforceable first or second lien (as
> indicated on the Mortgage Loan Schedule) on the Mortgaged Property, . . .
>
> (9)     From and after the Initial Sale Date and immediately prior to the transfer
> and assignment of each Mortgage Loan by the Seller to the Company, the Seller
> was the sole legal, beneficial and equitable owner of the Mortgage Note and the
> Mortgage.
>
> (16)     Each Mortgage Loan at the time it was made complied in all material
> respects with applicable local, state and federal laws, including, but not limited to,
> all applicable predatory and abusive lending laws.
>
> (22)     **The Seller has no knowledge of any circumstances or condition with
> respect to the Mortgage, the Mortgaged Property, the Mortgagor or the**

**Mortgagor's credit standing that can reasonably be expected to cause the Mortgage Loan to become delinquent.**

1.

157.     The HSBC originators also made representations and warranties with respect to the Mortgage Loans. By way of example, the prospectus supplement for HALO 2007-1 represents that HSBC Mortgage will make certain representations and warranties in the Master Mortgage Loan Purchase and Service Agreement with respect to each Mortgage Loan it originated as was included in the HALO 2007-1 trust, which representations and warranties will be assigned by the HSBC Bank to the Trustee on behalf of the Trust. In the Master Mortgage Loan Purchase and Servicing Agreement (which was filed as part of the Registration Statement for HSI 2006-2), HSBC Mortgage makes the following representations and warranties (among others) as to each Mortgage Loan:

> Subsection 7.02. Representations and Warranties Regarding Individual Mortgage Loans.
>
> The Seller [HSBC Mortgage] hereby represents and warrants to the Purchaser that, as to each Mortgage Loan, as of the related Closing Date for such Mortgage Loan:
>
> (i)   **The information set forth in the related Mortgage Loan Schedule and the Mortgage Loan data delivered to the Purchaser and the Custodian is complete, true and correct**; . . .
>
> (viii) Any and all requirements of any federal, state or local law applicable to the Mortgage Loans including, without limitation, usury, truth in lending, real estate settlement procedures, predatory and abusive lending, consumer credit protection, equal credit opportunity, fair housing or disclosure laws applicable to the origination and servicing of mortgage loans of a type similar to the Mortgage Loans have been complied with;
>
> (x)   The related Mortgage is properly recorded and is a valid, existing and enforceable (A) first lien and first priority security interest with respect to each Mortgage Loan which is indicated by the Seller on the Mortgage Loan Schedule on the Mortgaged Property, . . . .

(xxii) The origination, servicing and collection practices used with respect to each Mortgage Note and Mortgage . . . since origination, have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing industry.; ….

**(xxv) The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines in effect at the time the Mortgage Loan was originated**;

(xxvii) With respect to each First Lien Mortgage, the Mortgage File contains an appraisal of the related Mortgaged Property which satisfied the standards of FNMA and FHLMC, and was made and signed, prior to the closing of the Mortgage Loan, by a qualified appraiser, duly appointed by the Seller, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, whose compensation is not affected by the approval or disapproval of the Mortgage Loan and who met the minimum qualifications of FNMA and FHLMC. Each appraisal of the Mortgage Loan was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. For Second Lien Mortgage Loans, the Mortgage File contains an assessment of the collateral that meets the Underwriting Guidelines;

**(xxxii) The Seller has no knowledge of any circumstances or condition with respect to the Mortgage, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that can reasonably be expected to cause the Mortgage Loan to be an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value of the Mortgage Loan**;

**(xxxiii) No Mortgage Loan had an LTV or CLTV at origination in excess of 100%;**

**(xxxv) No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan;**

(xxxvi) The Assignment of Mortgage is in recordable form, except for the name of the assignee which is blank, and is acceptable for

recording under the laws of the jurisdiction in which the Mortgaged Property is located; . . .

(xlv) No predatory, abusive, or deceptive lending practices, including but not limited to, the extension of credit to a Mortgagor without regard for the Mortgagor's ability to repay the Mortgage Loan and the extension of credit to a Mortgagor which has no apparent benefit to the Mortgagor, were employed in connection with the origination of the Mortgage Loan;

(lvii) The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the Mortgagor's income, assets, liabilities and/or credit history to the proposed payment and such underwriting methodology does not rely on the extent of the Mortgagor's equity in the collateral as the principal determining factor in approving such credit extension. **Such underwriting methodology confirmed that at the time of origination (application/approval) the Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan;**

158.     In addition, pursuant to Subsection 6.04 of the Master Mortgage Loan Purchase and Service Agreement, HSBC Mortgage represents that it has a quality control program that insures the quality of HSBC Mortgage's origination practices and loan production:

Subsection 6.04.  Quality Control Procedures.

The Seller shall have an internal quality control program that verifies, on a regular basis, the existence and accuracy of the legal documents, credit documents, property appraisals, and underwriting decisions. The program shall include evaluating and monitoring the overall quality of the Seller's loan production and the servicing activities of the Seller. The program is to ensure that the Mortgage Loans are originated and serviced in accordance with Accepted Servicing Standards and the Underwriting Guidelines; guard against dishonest, fraudulent, or negligent acts; and guard against errors and omissions by officers, employees, or other authorized persons.
2.

159.     Defendants omitted the most important information relevant to the mortgage loans - the borrowers' names and the addresses of the collateral properties.   This

information was available to the Defendants, but Defendants intentionally concealed this information from investors. Defendants intentionally did not provide to investors the name of the borrowers or the addresses of the properties. Defendants' decision left investors unable to conduct their own due diligence on the mortgage loans and unable to evaluate the ability of borrowers to repay their loans. Defendants' obfuscation made it impossible for investors to determine if the loans or their collateral properties merited investment.

160.     Relator's information reveals Defendants included multiple loans from the same borrower (and secured by units in the same development) in an MBS trust without disclosing this material fact to investors.

161.     Any risk that the Defendants' representations and warranties were inaccurate or incomplete was allocated to Defendants through the "cure or repurchase" obligations. By way of example, the prospectus supplement for HSI 2007-NC1 provides as follows:

> Pursuant to the Pooling and Servicing Agreement, upon the discovery by the Sponsor, the Master Servicer, a Servicer, the Securities Administrator, the Depositor or the Trustee that any of the representations and warranties of the Sponsor contained in the Pooling and Servicing Agreement have been breached in any material respect as of the date made, with the result that value of, or the interests of the Trustee or the holders of the Certificates in, the related Mortgage Loan were materially and adversely affected, the party discovering such breach is required to give prompt written notice to the other parties. Subject to certain provisions of the Pooling and Servicing Agreement, within 60 days of the earlier to occur of the Sponsor's discovery or its receipt of notice of any such breach with respect to a representation or warranty made by it, it will be required to:
>
> - promptly cure such breach in all material respects;
>
> - if prior to the second anniversary of the Closing Date, remove each Mortgage Loan which has given rise to the requirement for

action [and] substitute one or more Substitute Mortgage Loans . . . or

- purchase such Mortgage Loan at a price equal to the unpaid principal balance of such Mortgage Loan as of the date of purchase . . .

162.     Similarly, the prospectus supplement for HSI 2006-WMC1 provides:

In the event of a breach of any representation or warranty made by the Sponsor with respect to the Mortgage Loans under the Mortgage Loan Purchase Agreement that does not also constitute a breach of any representation or warranty made by the Originator, the Sponsor will be obligated in the same manner as the Originator to cure such breach or repurchase, or provide a substitute for, the affected Mortgage Loan. However, the Sponsor will have no obligation to cure a breach or replace a Mortgage Loan if the relevant breach constitutes a breach of a representation or warranty made by the Originator under the Pooling and Servicing Agreement and the Originator fails to fulfill its repurchase (or substitution) obligation.

As in the case of the Originator, the Sponsor is obligated to indemnify the other parties to the Pooling and Servicing Agreement for any third party claim arising out of a breach of its representations and warranties regarding the Mortgage Loans. The obligation of the Sponsor to cure such breach or to substitute or purchase the affected Mortgage Loan and to indemnify for such breach constitute the sole remedies with respect to such breach available to the parties.

163.     The cure and repurchase obligations of HSBC Mortgage and Decision One as originators were also disclosed in the prospectus supplements.   By way of example, the prospectus supplement for  HALO 2007-1 provides as follows:

Pursuant to the Pooling and Servicing Agreement, upon the discovery by a responsible officer of the Master Servicer, the Servicers, the Securities Administrator, the Depositor or the Trustee that any of the representations and warranties of such Originator [HSBC Mortgage] contained in the respective Master Mortgage Loan Purchase and Servicing Agreement have been breached in any material respect as of the date made, with the result that value of, or the interests of the Trustee or the holders of

the Certificates in, the related Mortgage Loan were materially and adversely affected, the party discovering such breach is required to give prompt written notice to the other parties. Pursuant to the respective Master Mortgage Loan Purchase and Servicing Agreement, the Originator [HSBC Mortgage] will provide the Trustee with notice of any such breach.   Subject to certain provisions of the respective Master Mortgage Loan Purchase and Servicing Agreement, within sixty days of the earlier to occur of such Originator's discovery or its receipt of notice of any such breach with respect to a representation or warranty made by it, it will be required to

- promptly cure such breach in all material respects;

- if prior to the second anniversary of the Closing Date, remove each Mortgage Loan which has given rise to the requirement for action [and] substitute one or more Substitute Mortgage Loans . . . or

- if prior to the second anniversary of the Closing Date, and at the option of the Depositor, or if after the second anniversary of the Closing Date, purchase such Mortgage Loan at a price equal to the unpaid principal balance of such Mortgage Loan as of the date of purchase . . .

164.      The "cure or repurchase" obligations disclosed in the prospectus supplements are summaries of HSBC Bank's, HSI's, HSBC Mortgage's or Decision One's obligations from the Pooling and Servicing Agreements and/or Mortgage Loan Purchase Agreements.   Sections 2.03(b) and (d) of the Pooling and Servicing Agreement for HSI 2007-NC1 provide:

(b) In addition to the repurchase or substitution obligations referred to in Section 2.03(d) below, the Sponsor shall indemnify the Depositor, any of its Affiliates, the Master Servicer, each Servicer, the Securities Administrator, the Trustee and the Trust and hold such parties harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses (including, without limitation, any taxes payable by the Trust) resulting from any third party claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach by the Sponsor of any of its

representations and warranties or obligations contained in this Agreement. . . .

(d) It is understood and agreed that the representations and warranties of the Sponsor set forth in Section 4 of the Purchase Agreement and assigned to the Trustee by the Depositor hereunder shall survive the transfer of the Mortgage Loans by the Depositor to the Trustee on the Closing Date, and shall inure to the benefit of the Trustee and the Certificate holders notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage and shall continue throughout the term of this Agreement. Upon the discovery by any of the Sponsor, the Depositor, the Securities Administrator, the Trustee, the Master Servicer or any Servicer of a breach of any of the Sponsor's representations and warranties set forth in Section 4 of the Purchase Agreement, the party discovering the breach shall give prompt written notice to the others. Within 30 days of the earlier of either discovery by or notice to the Sponsor of any breach of any of the foregoing representations or warranties that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificate holders therein, the Sponsor shall use its best efforts to cure such breach in all material respects and, if such defect or breach cannot be remedied, the Sponsor shall, at the Depositor's instructions as specified in writing and provided to the Sponsor and the Trustee, (i) if such 30-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in the same manner and subject to the same conditions set forth in this Section 2.03 or (ii) repurchase such Mortgage Loan at the Repurchase Price. . . .

165.     Similarly, Section 2.03(d) of the Assignment, Assumption and Recognition Agreement for   HALO 2007-1 between HSBC Bank, HSI, the Trustee and HSBC Mortgage provides:

The Company [HSBC Mortgage] hereby acknowledges and agrees that the remedies available to the Assignor [HSBC Bank], the Assignee [HSI] and the Trust (including the Assignee and the Company acting on the Trust's behalf) in connection with any breach of the representations and warranties made by the Company set forth in Section 5 hereof shall be as set forth in Subsection 7.03 of the Purchase Agreement as if they were set forth herein

(including without limitation the repurchase and indemnity obligations set forth therein).

166.     Section 703(d) of the Purchase Agreement for HALO 2007-1 provides:

Upon discovery by the Seller [HSBC Mortgage] or the Purchaser [HSBC Bank] of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser (or which materially and adversely affects the value of a Mortgage Loan or the interests of the Purchaser in the related Mortgage Loan in the case of a representation and warranty relating to a particular Mortgage Loan), or in the event that any Mortgagor fails to make the first payment due to the Purchaser following the Closing Date, the party discovering such breach shall give prompt written notice to the other.

Within sixty (60) days of the earlier of either discovery by the Seller, or notice to the Seller, of any breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans or the Purchaser's interest in a Mortgage Loan or the Mortgage Loans, the Seller shall use its best efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, the Seller shall, at the Purchaser's option, repurchase such Mortgage Loan at the Repurchase Price.

167.     Relator's information demonstrates that the intrinsic values of the collateral properties were wholly inadequate relative to the loan amounts.

168.     The best evidence of intrinsic value is an arms-length sale of a property. Relator's information demonstrates that most collateral properties securing the loans were significantly less than the loan amount. If a property's intrinsic value is significantly less than the loan amount, then there are increased risks that a borrower will not repay the loan and there will be greater losses after a default. Mortgage loans with high loan-to-value ratios leave the related borrower with little or no equity in the related mortgaged property. Relator's information shows most of the mortgage loans included in the MBS

trusts had negative equity from the outset (*i.e.*, the property was worth less than the amount of a loan and LTVs were in excess of 100% at the time a loan was made).

169.     Defendants knew (or should have known) about the collateral properties' inflated values.  Defendants HSBC Mortgage and Decision One originated many of the loans for the HSBC MBS transactions.  In addition, HSBC Bank provided credit lines to the third party originators and constantly monitored the inventory backing the credit lines.

170.     Defendants knew or should have known inflated values were a pervasive problem.  Defendants were aware (or should have been aware) that mortgage loans they originated (or purchased) and sold to the MBS, and mortgage loans backing RMBS sold to the CDOs, were products of inflated values.  Nevertheless, Defendants did not disclose these material facts regarding inflated values (or include a risk factor about inflated values) in the Registration Statements for the MBS or the Offering Documents for the CDOs.

## B.     DEFENDANTS USED NON-DELIVERY OF LOAN DOCUMENTS TO CONCEAL UNRELIABLE BORROWERS AND OVERVALUED PROPERTIES

171.     As described above, the prospectuses for the MBS represent that HSI, as depositor, would deliver certain documents to the custodian (as set forth in Section 2.01 of the related Pooling and Servicing Agreements), including the original notes bearing all intervening endorsements necessary to show a complete chain of endorsements from the original payee endorsed in blank, the original assignment of mortgages, the original recorded mortgage with evidence of recording thereon, and other related documents.

172.     Defendants knew, on the date the MBS were issued, as of the date of each prospectus supplement and as of the date of each mortgage loan purchase agreement, that they would not deliver the original notes or valid assignments to the related MBS trust on

a timely basis.  In fact, it was Defendants' practice not to do so.  Defendants originated and/or purchased from originators mortgage loans that would be sold by Defendants into the MBS trusts and had the obligation to, and disclosed to purchasers that they would, deliver the original notes and valid assignments in a timely manner.  Defendants failed to do so for substantially all the mortgage loans for each of the dozens of MBS transactions.

173.     Defendants failed to disclose how many of the mortgage loans included in each MBS trust were registered with MERS under the MERS System.  Instead, they mislead investors by representing (by omission) that none of the mortgage loans would be registered in the MERS system.  None of the prospectus supplements for the HSBC RMBS trusts disclosed that any MERS loans would be included in the trust.

174.     As described above, Defendants furthered their fraud on investors by failing to record assignments in the name of the MBS trusts.  This allowed Defendants to conceal from investors the names of the borrowers and the addresses of the properties securing the mortgage loans owned by the MBS trusts.  By recording mortgages in the name of "MERS" and registering the assignment to the trust in the "MERS System," the Defendants were able to further their fraud because investors had no way to determine what mortgage loans a MBS trust owns.  While the prospectuses for the MBS represented that mortgage loans may be held through the MERS System if specified in the related prospectus supplement, the Defendants failed to specify that loans were so held, thereby representing to investors that no loans were being held through the MERS System. Relator's information reveals that for many of the loans held by the MBS trust, the mortgages were in the name of MERS.  Defendants intentionally omitted disclosing in the prospectus supplements the high percentage of mortgages registered in the MERS

System owned by the MBS trust, information material to investors. Failing to disclose this information made the offering documents for the HSBC MBS false and misleading.

175. Defendants understood the risks to the MBS of holding mortgage loans through the MERS System yet failed to disclosure such risks to investors. Defendants failed to include a MERS risk factor in the MBS prospectus supplements notwithstanding Defendants knowledge of the risks associated with foreclosing on mortgages held through the MERS System where the MBS trust did not have possession of the original note or did not have a valid recorded assignment of the mortgage in the name of the trust. As a legal matter, such an assignment to the applicable MBS trust is necessary under applicable law to commence any foreclosure proceeding because MERS as nominee does not have standing to commence foreclosure proceedings (and the MBS trusts did not have possession of the original mortgage notes). It was common practice in the industry to include such a risk factor in the registration statements, yet Defendants failed to include one. Failure to include a MERS risk factor makes the prospectus for the HSBC MBS false and misleading.

176. In addition to omitting material facts regarding (i) the credit quality of borrowers, (ii) the overvaluation of collateral properties contained in the Registration Statements, and (iii) the assignment of mortgage loans, the Registration Statements also contained false statements about credit ratings and compliance with underwriting guidelines.

## C. DEFENDANTS FAILED TO COMPLY WITH UNDERWRITING GUIDELINES DESPITE REPRESENTING THEY WOULD IN THE OFFERING DOCUMENTS

177. Relator's information demonstrates that Defendants failed to conduct adequate and sufficient due diligence to ensure the loans sold to the MBS trusts were not defective and otherwise complied with the representations in the Registration Statements. The

mortgage loans included in the MBS were comprised of loans originated by HSBC (via HSBC Mortgage and Decision One) and loans originated by third party originators.

178.    Based on Relator's information, it appears that none of HSBC Securities, HSBC Bank nor HSI applied any standards in approving loans included in the MBS trusts. Apparently, HSBC Mortgage and Decision One would routinely originate loans, and HSBC Bank, HSI and HSBC Securities would approve and purchase loans, where the borrowers clearly did not have the ability to repay and where the property securing the loan was grossly overvalued, and would include such loans in the MBS trusts.  The Registration Statements were false and misleading because they represented that each loan would conform to the stringent underwriting standards described in detail therein which would ensure that each borrower was credit worthy and each property would provide adequate security.  The Registration Statements failed to disclose that in practice, such underwriting standards were not applied for loans originated by HSBC, nor were they applied for loans purchased from third party originators.

179.    Defendants' guidelines required them to, and the disclosure in the Registration Statements stated that they would, originate loans in accordance with HSBC's underwriting guidelines.  Relator's information reveals that most of the mortgage loans originated by HSBC and by third-party originators and sold to the MBS trusts should have been excluded.  Defendants intentionally did not ensure these mortgage loans were underwritten in accordance with applicable guidelines (or had compensating factors). HSBC Mortgage and Decision One originated such loans, HSBC Bank purchased such loans, and HSI sold such mortgage loans to the MBS trusts knowing they did not meet the guidelines.

180.     Relator's information reveals that most of the loans sold to the MBS trusts did not conform to the underwriting standards of the third-party originators (as Defendants stated in the Registration Statements).  HSBC claimed in the prospectus supplements (and represented in the pooling and servicing agreements and/or mortgage loans purchase agreements) that it sold to HSI, as the case may be, and to the applicable MBS trust only those mortgage loans meeting the originator's underwriting guidelines.  Relator's information shows that most of the mortgage loans did not meet the originator's underwriting guidelines.  Defendants knew (or should have known) that there were high percentages of defective loans, but included such loans in the MBS trusts anyway. Defendants failed to disclose this material information in the Offering Documents.

181.     The prospectus supplements for each MBS described the mortgage loan underwriting guidelines.  Each prospectus supplement stresses that these guidelines were applied to the loans and were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and value of a collateral property as adequate security for the loan.

182.     For example, the prospectus supplement for the HSI 2007-HE2 trust purports to describe the underwriting guidelines of Decision One, the originator of 71.95% of the loans for the HSI 2007-HE2 trust.  In describing the Decision One underwriting guidelines, the prospectus supplement for HSI 2007-HE2 states:

> The Decision One Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan. All of the Mortgage Loans in the Final Mortgage Loan Pool that were originated or acquired by Decision One Mortgage were also underwritten with a view toward the resale of such Mortgage Loans in the secondary mortgage market. While Decision One

71

Mortgage's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, Decision One Mortgage also considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio, as well as the type and use of the mortgaged property.

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. . . . Mortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. . . . Decision One Mortgage provides two appraisal resources: Core Logic, a cascading AVM tool ranking 10 AVM companies by hit rate and confidence level, and access to a board certified appraisal review group through its partnership with HSBC. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.

183.     The prospectus supplement for the HSI 2007-HE2 trust stresses the individualized review process that Decision One undertakes to make sure that the borrower is creditworthy and the properties are correctly valued:

Under each of [Decision One's] programs, Decision One Mortgage reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service to income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property. The Decision One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure that complies with applicable federal and state laws and regulations and requires Decision One Mortgage's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance.

184.　　The prospectus supplement for the HSI 2007-HE2 trust stresses HSBC's quality control program which it represents insures that the quality of mortgage loans it originates are high:

> Each of Decision One Mortgage's 10 hubs is served by a Regional Credit Officer (RCO), who reports directly to the Asset Management Group in the Fort Mill Support Office. The RCO monitors consistency and quality for the entire hub, and serves as a liaison between the hubs and the support office.
>
> To mitigate fraud and risk, each underwriter receives training in Fraud Detection, Red Flag Awareness and Investigation. Underwriters have access to internal and external resources and tools to identify risk and confirm the integrity of data in areas of credit capacity and collateral. Hub underwriters are audited in two fashions: first, 15 percent of all loans funded by the hub receive internal audit for quality; and, second, all hubs receive quarterly QAC audit from the Quality Control group in the Fort Mill Support Office.
>
> Decision One Mortgage runs all loan files through its proprietary 1003 verification system, Data Integrity Search and Score (DISSCO), and through a proprietary ineligible party database, HSBC Involved Party Partnership On-Line (HIPPO). A Certificate of Occupancy is also required for owner-occupied properties, as well as a signed 4506 if necessary for tax verification.
>
> Decision One Mortgage completes internal VOE, VOR and VOO prior to closing to validate application information on every loan file. Each application is also given an external data integrity score to validate name, address, employment information and SSN. Additionally, a Decision One Mortgage employee verbally verifies the applicant's employment information. Welcome calls are made on each loan prior to the first due date to recertify the address and phone number, to review the loan's terms and conditions with the customer, and to notify the customer of the pending sale of their loan. Decision One Mortgage also completes a random and targeted quality control on three to five percent of monthly production.

185.　　For example, the prospectus supplement for the HSI 2006-WMC1 trust purports to describe the underwriting guidelines of WMC Mortgage Corp. according to which all

of the loans were originated.  In describing the WMC underwriting guidelines, the

prospectus supplement for HSI 2006-WMC1 states:

> The Mortgage Loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp. (collectively, the "UNDERWRITING GUIDELINES") or (ii) purchased by WMC Mortgage Corp. after re-underwriting the Mortgage Loans generally in accordance with the Underwriting Guidelines. . . . The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults. On a case-by-case basis WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt-to-income ratio ("DEBT RATIO"), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. . . .

> Under the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC Mortgage Corp.-approved appraiser or by WMC Mortgage Corp.'s in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model.

186.     For example, the prospectus supplement for the HSI 2007-NC1 trust purports to

describe the underwriting guidelines of New Century Mortgage Corporation according to

which all of the loans were originated.   In describing the New Century underwriting

guidelines, the prospectus supplement for HSI 2007-NC1 states:

> The New Century Underwriting Guidelines are primarily intended
> to assess the borrower's ability to repay the related mortgage loan,
> to assess the value of the mortgaged property and to evaluate the
> adequacy of the property as collateral for the mortgage loan. . . .
> While New Century's primary consideration in underwriting a
> mortgage loan is the value of the mortgaged property, New
> Century also considers, among other things, a borrower's credit
> history, repayment ability and debt service-to-income ratio, as well
> as the type and use of the mortgaged property. . . .
>
> Mortgaged properties that are to secure mortgage loans generally
> are appraised by qualified independent appraisers. These appraisers
> inspect and appraise the subject property and verify that the
> property is in acceptable condition. Following each appraisal, the
> appraiser prepares a report that includes a market value analysis
> based on recent sales of comparable homes in the area and, when
> deemed appropriate, replacement cost analysis based on the current
> cost of constructing a similar home. All appraisals are required to
> conform to the Uniform Standards of Professional Appraisal
> Practice adopted by the Appraisal Standards Board of the
> Appraisal Foundation and are generally on forms acceptable to
> Fannie Mae and Freddie Mac. The New Century Underwriting
> Guidelines require a review of the appraisal by a qualified
> employee of New Century or by an appraiser retained by New
> Century. . . .
>
> Under each of [New Century's] programs, New Century reviews
> the applicant's source of income, calculates the amount of income
> from sources indicated on the loan application or similar
> documentation, reviews the credit history of the applicant,
> calculates the debt service-to-income ratio to determine the
> applicant's ability to repay the loan, reviews the type and use of
> the property being financed, and reviews the property. In
> determining the ability of the applicant to repay the loan, a
> qualifying rate has been created under the New Century
> Underwriting Guidelines that generally is equal to the interest rate
> on that loan. The New Century Underwriting Guidelines require
> that mortgage loans be underwritten in a standardized procedure
> which complies with applicable federal and state laws and
> regulations and requires New Century's underwriters to be
> satisfied that the value of the property being financed, as indicated

by an appraisal and a review of the appraisal, currently supports the outstanding loan balance. . . .

The maximum loan-to-value ratio depends on, among other things, the purpose of the mortgage loan, a borrower's credit history, home ownership history, mortgage payment history or rental payment history, repayment ability and debt service-to-income ratio, as well as the type and use of the property. . . . All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment. Verification of the source of funds, if any, that are required to be deposited by the applicant into escrow in the case of a purchase money loan is required.

187.    For example, the prospectus supplement for the HALO 2007-1 trust purports to

describe the underwriting standards of American Home Mortgage Corp., the originator of

33.16% of the loans for the HALO 2007-1 trust.  For example, the prospectus supplement

for the HALO 2007-1 trust states:

The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present.  In the case of investment properties and two- to four-Unit dwellings, income derived from the mortgage property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, the Originator expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

The Originator underwrites a borrower's creditworthiness based solely on information that the Originator believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring. . . . .

For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an

ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility. . . .

Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by the Originator's vendor management company or an underwriter of the Originator or a mortgage insurance company contract underwriter.

188.     Relator's information shows that HSBC and the third party originators systematically disregarded their respective underwriting guidelines. Relator's information on loans from third party originators shows a pattern of un-creditworthy borrowers and properties of insufficient value to collateralize the amount of the related loan.

189.     Defendants originated many of the loans included in the MBS through HSBC Mortgage and Decision One. With respect to third party originated loans, Defendants had the opportunity to review the loan files for each loan as part of their due diligence in the securitization process. Had Defendants undertaken that review, they would have

discovered that the actual underwriting practices of the originators, including the non-party originators listed above, were vastly inconsistent with the statements in the Registration Statements regarding the high underwriting standards of the third party originators.

190.      Relator's information reveals that HSBC Mortgage, Decision One and the third party originators that sold loans to HSBC Bank and which were included by HSBC in the MBS trusts had serious underwriting flaws.  The statements regarding compliance with the underwriting guidelines of the originators in the Registration Statements were false or material misleading.

191.      Defendants included these false and misleading statements in order to make investors comfortable with the quality of the mortgage loan originators and the specific loan portfolios included in each MBS trust in order to induce investors not to conduct their own due diligence and not to ask further questions about the mortgage loans, including about the names and addresses of the borrowers.

192.      Because the rating agencies assigned ratings to the MBS based on information about the mortgage collateral provided by the Defendants, the ratings on the MBS were artificially inflated because the information about the mortgage loan collateral provided by the Defendants was false and misleading.  Defendants made the very same material omissions and misrepresentations to the rating agencies that they made to investors in the Registration Statements.  These omissions and misrepresentations were reflected in the artificially inflated ratings on the MBS.

193.      Since the issuance of the MBS, the rating agencies have dramatically downgraded their ratings, reflecting the true underwriting practices used to originate the

mortgage loans, and the intrinsic value of collateral properties and credit quality of the mortgage loans. For example, the ratings on the Class II-A-3 Certificates (CUSIP 44328BAE8) issued by HSI Asset Securitization Corporation Trust 2006-HE2 which were initially rated AAA by Moody's at issuance were downgraded to Ba2 on April 21, 2008, to Caa1 on October 23, 2008, and to Ca on March 13, 2009. The other HSBC MBS have suffered similar ratings downgrades.

194.     Relator's information has revealed massive delinquency and default rates of the loans backing the MBS, clear proof that the loans were not originated in adherence to the stated underwriting guidelines. The majority of the MBS purchased or funded by the U.S. Government were rated A to AAA and were represented as long-term, stable investments. However, a significant percentage of the loans backing the MBS have defaulted, have been foreclosed, or are delinquent, resulting in massive losses to holders. The overall poor performance of the loans is a direct consequence of the fact that they were defective from the start and not underwritten in accordance with the applicable underwriting guidelines as represented in the Registration Statements.

195.     If *any* loans were underwritten in accordance with the standards represented in the Registration Statements, then the MBS would have experienced substantially fewer defaults, fewer foreclosures, fewer delinquencies and higher recovery amounts upon foreclosure than occurred for loans purportedly securing the MBS. If *any* loans were underwritten using the appraisal, valuation methods and standards represented in the Registration Statements, then the MBS would not have experienced massive losses.

### D.   DEFENDANTS OMITTED AND MISREPRESENTED MATERIAL INFORMATION IN THE OFFERING DOCUMENTS FOR THE CDOS

196.     In connection with each CDO transaction, HSBC Securities created a marketing/pitch book and/or term sheet that described the key features and terms of the deal. Specific information about the collateral manager's history and business experience was prepared by the collateral manager, but otherwise the information was created by HSBC Securities. After the pitchbook and/or term sheet was delivered to purchasers, HSBC Securities would prepare an offering circular, which also described the terms of the CDO transaction, including the capital structure, the collateral debt securities, the manager and certain risk factors.[10] Often, as part of the Offering Documents, HSBC Securities would provide purchasers with historical performance analysis that showed very low default and loss rates, and high recovery rates, on mortgage related securities such as RMBS, which suggested that the default cushions on the CDO securities provided in the Offering Documents were more than sufficient to protect the investment.[11] The Offering Documents were prepared by the CDO desk at HSBC Securities and were distributed by the marketing staff employed by HSBC Securities' CDO desk to the Failed

---

[10] The offering circulars for the CDOs would often state that it was prepared by the co-issuers, which are special purpose entities that had no employees and were created solely to purchase the collateral debt securities and issue notes. HSBC Securities was the sponsor, structurer, arranger, initial purchaser and placement agent for each CDO transaction. HSBC Securities, not the co-issuers, actually prepared the Offering Circulars and any representation to the contrary in the Offering Documents is false. *See United States SEC v. Citigroup*, 11 Civ. 7387 (JSR), 2011 U.S. Dist. LEXIS 135914 at*14-*15 (S.D.N.Y. Nov. 28, 2011), at ¶ 39. Investors did not have contact with the co-issuers and each purchased securities in the CDOs directly from HSBC Securities, which was the initial purchaser and placement agent. HSBC Securities disseminated the Offering Circular and pitch book for the CDOs directly to purchasers, not the issuers.

[11] The Offering Documents would often provide a break-even statistical default analysis that was an important metric for evaluating the aggregated risk of default of the thousands of mortgages and MBS that served as the collateral for the CDOs. These risks appeared low in light of the default cushions built into the CDOs relative to historical performance provided by HSBC Securities, assuming the collateral was similar as suggested by HSBC Securities. However, HSBC Securities knew the mortgage collateral in the CDOs was not similar to mortgage loans which formed the basis of the historical performance data provided to investors.

Credit Unions, the Failed Banks, the Failed Pension Plans and the other Government Entities that the marketing staff covered. Such entities reasonably relied on the Offering Documents.

197.     Defendants' false statements and material omissions made in connection with the Offering Documents have never been retracted and have endured in form and effect to the present. Thus all financing, guarantees, insurance, and payments associated with the CDOs made by the U.S. Government were made further to and in view of Defendants' false statements, including the Offering Documents.

198.     As described above, the Defendants' originated and/or purchased large numbers of defective loans and included them as collateral for the MBS. HSBC Securities would then sell its unsold inventory of MBS (and other CDOs) to the CDOs. However, HSBC Securities failed to disclose to purchasers of the CDOs the same material information Defendants failed to disclose to purchasers of the MBS described above.

199.     The Offering Documents for each CDO represented that the collateral was comprised of a certain percentage of "mortgage backed securities." Each of these representations was false and misleading since the securities that purportedly were mortgage backed were not secured by notes and mortgages. As demonstrated by Relator's information, and described above, neither valid assignments nor original notes were delivered to the MBS trusts which were collateral for the CDOs. Thus, those MBS trusts never legally owned the notes and related mortgages. Simply put, the MBS were not "mortgage backed securities" as defined by the Offering Documents.

200.     HSBC Securities failed to disclose to CDO purchasers the same information it failed to disclose to MBS purchasers, including the poor borrower credit and inflated

property valuations, about the mortgage notes and mortgages purportedly owned by MBS or the RMBS used as collateral for the CDOs. HSBC Securities also did not disclose to purchasers of the CDOs material information regarding instances of fraudulent and/or poor underwriting by the third-party loan originators who sold mortgage loans to certain of the Defendants (who then sold such loans to purchasers of the MBS or to sponsors of RMBS which were used as collateral for CDOs). Instead, HSBC Securities sold MBS and RMBS to the CDOs which it knew, or should have known, were secured by mortgage loans which were defective and did not conform to the underwriting standards set forth in the Prospectus Supplements for such MBS or RMBS.

### 1.  HSBC PURCHASED CREDIT PROTECTION FROM AIG AND SOLD CDOS TO MAIDEN LANE III

201.    During the period that HSBC Securities issued CDOs, HSBC also entered credit default swaps with AIG which allowed HSBC to purchase protection on certain CDOs. A credit default swap is like an insurance policy on a security – the buyer of protection (in this case HSBC) pays the insuring party (in this case AIG) periodic insurance payments and in exchange the insuring party (AIG) will pay the insured (HSBC) certain amounts in the event those CDOs do not perform well. In the event an insured CDO lost market value, the credit default swaps required AIG to post collateral (*i.e.*, transfer money) to HSBC for the loss of value of the CDOs.

202.    As a result of its obligation to post collateral on its credit default swaps, between September 2008 and December 2008, AIG paid approximately $200,000,000 to HSBC and tens of billions more to other counterparties. In November 2008, the FRBNY and the U.S. Treasury created Maiden Lane III to "alleviate capital and liquidity pressures on AIG associated with credit derivative contracts written by [AIG]." Maiden Lane III

received $24.3 billion from the FRBNY and $5 billion from AIG, which was used to purchase CDOs from the swap counterparties of AIG, including HSBC. HSBC was paid par (100% of principal) for the CDOs insured by AIG in exchange for HSBC terminating the credit default swaps it had with AIG.[12] According to disclosures made by AIG, HSBC was paid millions for the CDOs and also retained the $200,000,000 of cash previously paid by AIG (in excess of *$200,000,000 total*).

203.     At the time that HSBC entered into the credit default contracts with AIG, and at the time that Maiden Lane III purchased the CDOs from HSBC, HSBC failed to disclose the same information it failed to disclose to the CDO and MBS purchasers. HSBC failed to disclose information regarding the poor borrower credit and inflated property valuations for notes and mortgages purportedly owned by the MBS or RMBS used as collateral for CDOs where HSBC purchased protection from AIG (and later sold to Maiden Lane III). HSBC Securities also did not disclose to AIG or Maiden Lane III material information regarding instances of fraudulent and/or poor underwriting by HSBC or the third-party loan originators who sold mortgage loans to certain of the Defendants who then sold such loans to purchasers of the MBS or to sponsors of RMBS used as collateral for such CDOs.

## E.     DEFENDANTS CONTROLLED AND DIRECTED EVERY STEP OF THE SECURITIZATION PROCESS

204.     Defendants are directly responsible for the omissions and misstatements of material fact contained in the Registration Statements for the MBS because they

---

[12] According to the FRBNY website, "[t]he counterparties agreed to sell CDOs to ML III LLC in exchange for a purchase payment from ML III LLC and their retention of collateral previously posted by AIGFP under the related credit derivative contracts, for an overall consideration of par. In connection with any such purchase, each AIGFP counterparty agreed to terminate the related credit derivative contracts between it and AIGFP."

prepared, signed, filed and/or used those documents to market and sell the MBS, and/or directed and controlled such activities and chose the trustee for each MBS trust.

205.     As described above, HSBC originated a substantial number of the loans packaged into the MBS (*e.g.*, HSBC Mortgage originated 49.36% of loans and Decision One originated 4.78% of the loans included in the HALO 2007-1 transaction, Decision One originated 19.99% of the loans included in the HSI 2007-HE1 transaction, Decision One originated 71.95% of the loans included in the HSI 2007-HE2 transaction, and HSBC Mortgage originated 26.5% of the loans in the HALO 2007-2 transaction).   HSBC Mortgage and Decision One represented that the loans it originated and included in the MBS trusts were originated in accordance with the underwriting criteria specified in the Registration Statements. Also, HSBC Bank represented that the loans it purchased from HSBC Mortgage and Decision One and the third party originators included in the MBS trusts were originated in accordance with the underwriting criteria specified in the Registration Statements.  Defendants were the source of all information about these mortgage loans included in the MBS trusts and included in the Registration Statements since Defendants either originated or purchased the loans and represented that they were in possession of the loan files for each loan.  Defendants are singularly to blame for the poor quality and haphazard diligence on the loans included in the HSBC MBS trusts.

206.     Defendants selected the third party mortgage originators from which to obtain additional mortgage loans, selected the loans to include in each MBS trust, and chose the servicer of the loans and the parties to administer the MBS trust.  Defendants had regular contact, and a direct contractual relationship, with the third party originators that originated the mortgage loans.

207.      Defendants were also in the position to receive the documentation supporting each mortgage loan (the "Loan File"), which typically includes the borrower's loan application, credit report, schedule of assets, liabilities and income, income, asset and employment verifications, lien disclosures and appraisal of the subject property for each mortgage loan purchased from third-party originators as part of their purchase. Defendants selected the mortgage loans to place in each MBS trust with full access to detailed information on each borrower and property and thus had the ability to ensure the disclosures in the Offering Documents were both accurate and complete and did not contain any omissions of material fact. Defendants had access to information to determine whether their representations and warranties in the relevant pooling and servicing agreement, and in the purchase agreements that HSBC Bank had with third party originators, were accurate. By contrast, potential purchasers had only one source of information about the mortgage loans: Defendants. Potential purchasers had no means to verify the accuracy of information they received from Defendants.

## F.   SALES OF RMBS TO AIG UNDER AIG'S SECURITIES LENDING PROGRAM AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH

208.      During the period that Defendants were issuing RMBS using false Offering Documents as described herein, HSBC also entered into securities lending arrangements with AIG which permitted HSBC to sell RMBS to AIG with funds provided by HSBC. In a securities lending transaction, the lender (in this case HSBC) lends money to a borrower with certain securities as collateral and the borrower (in this case AIG) receives cash. In a typical transaction in a normal market environment, AIG typically received cash equal to or exceeding the value of the securities deposited with HSBC as collateral. AIG reinvested the cash it received from HSBC in order to earn a profit on the

transaction. As it transpired, HSBC and others convinced AIG to reinvest that cash in RMBS.

209. Before the financial crisis, AIG was active in the securities lending market and was a favorable counterparty because it had a strong credit rating. Because of its credit rating and the high quality of its securities portfolio, AIG could borrow cash very cheaply through securities lending transactions. Lenders would often provide AIG cash equal to 100% or more of the value of the collateral security. During the period from 2005 to 2007, AIG increased the size of its securities lending program and invested a majority of the cash in MBS, including MBS issued by HSBC. Since MBS have long durations, AIG's investment in MBS created a maturity mismatch – the maturity dates of the MBS were long but the terms of the securities loans which generated the cash for AIG to buy the MBS were short. Prior to the financial crisis, AIG's counterparties would routinely renew these securities loans and not demand changes in the terms of the transactions. When the financial crisis started, HSBC and others extracted stiffer terms from AIG, including a higher interest rate on the cash and more collateralization.

210. HSBC was one of AIG's largest securities lending counterparties and a major vendor of MBS to it. HSBC knew that AIG was using the funds it received from HSBC to purchase HSBC MBS. As demonstrated by Relator's information, HSBC knew that the HSBC MBS that AIG purchased with the proceeds of its securities lending program in reliance on the material omissions and misrepresentations on the Offering Documents were defective and were declining in value. HSBC knew that AIG could not repay securities borrowers in the event AIG was forced to sell the HSBC MBS in order to repay securities borrowers. Therefore, HSBC demanded better terms, both in terms of rates and

amount of cash collateral, because it knew that AIG had purchased HSBC MBS.  In order to repay HSBC and other securities borrowers, AIG was forced to sell MBS, including the HSBC MBS that it purchased in reliance on the material omissions and misrepresentations in the Offering Documents, at a loss.

211.    On October 3, 2008, AIG received a $37.8 billion bailout from the Treasury under the Troubled Asset Relief Program (TARP) so that AIG could pay back AIG's securities lending counterparties.  In connection with HSBC's securities lending arrangements with AIG, HSBC received $3.3 *billion* from the Government's bailout of AIG (this is in addition to the $200,000,000 that HSBC received for the CDOs).

## G. DIRECT LOAN SALES TO FHLMC AND FNMA AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH

212.    Relator's  information demonstrates that HSBC and its affiliates sold defective mortgage loans to both Freddie Mac and Fannie Mae.  Relator has reviewed hundreds of mortgage loans that HSBC sold to the GSEs and has determined that such loans were originated using inflated values and that HSBC made misrepresentations to the GSEs as to the underwriting, origination and quality of such mortgage loans.  In addition, Relator has determined that HSBC and its affiliates breached representations and warranties by failing to report thousands of defective loans it sold to the GSEs.

213.    In selling residential mortgage loans to the GSEs, HSBC made representations and warranties to the GSEs that the loans complied in all respects with the standards outlined in the Single Family Selling Guide (the "Fannie Guide"), Single-Family Seller/Servicer Guide (the "Freddie Guide"), and the applicable purchase contracts, which collectively set forth underwriting, documentation, quality control, and self-reporting requirements.

214.     HSBC made representations and warranties, none of which have been retracted, to Fannie Mae concerning each residential mortgage loan that it originated and sold to Fannie Mae, including but not limited to, the following:

(a)     The mortgage conformed to all the applicable requirements in the Fannie Guide and the purchase contracts;

(b)     The mortgage was an "acceptable investment";

(c)     All required loan data was true, correct, and complete;

(d)     Automated underwriting conditions were met for loans processed through an automated underwriting system; and

(e)     No fraud or material misrepresentation was committed by any party, including the borrower.

215.     HSBC made similar representations and warranties, none of which have been retracted, to Freddie Mac concerning each residential mortgage loan they originated and sold to Freddie Mac, including, but not limited to, the following:

3.     (a)     The terms, conditions, and requirements stated in the Freddie Guide and purchase contracts were fully satisfied;

4.     (b)     All warranties and representations of HSBC were true and correct;

5.     (c)     The loan was "investment quality"; and

(d)     HSBC had not misstated or omitted any material fact about the mortgage.

216.     HSBC was also generally required to self-report to Fannie Mae and Freddie Mac any loans it identified as defective and/or otherwise ineligible for sale to the GSEs.

HSBC's statements to Fannie Mae and Freddie Mac have never been retracted and have endured in form and effect to the present.

217.    Relator's information reveals that HSBC, with reckless disregard, sold to the GSEs residential mortgage loans originated by HSBC or its affiliates which were defective and/or otherwise ineligible for sale to the GSEs. HSBC sold residential mortgage loans that it originated to the GSEs with representations and warranties (i) that the loans conformed to the Fannie Guide, Freddie Guide and/or applicable purchase contracts, (ii) that the loans were acceptable investments or investment quality, (iii) that all required loan data was true, correct, and complete, (iv) that automated underwriting conditions had been met; (v) that no material misrepresentations were committed in connection with the loans; and (vi) that they had not misstated or omitted any material fact about the loans; when, in fact, many of those representations or warranties were not accurate, as many of the loans were defective and/or otherwise ineligible for sale to the GSEs.

218.    HSBC also did not self-report to the GSEs mortgage loans originated by HSBC or its affiliates which were internally identified as defective and/or otherwise ineligible for sale to the GSEs. Defendants' alleged false and fraudulent statements were made for the first time prior to 2009 and have never been retracted and endure in form and effect to the present time. HSBC's failure to self report occurred after 2009 and continues to the present.

## H. DIRECT LOAN SALES TO MORGAN STANLEY AND GOLDMAN SACHS (AND OTHER THIRD PARTY SPONSORS OF RMBS) AND FALSE STATEMENTS MADE IN CONNECTION THEREWITH

219.    Relator's information demonstrates that HSBC and its affiliates sold defective mortgage loans to Morgan Stanley and Goldman Sachs. Relator has reviewed hundreds

of mortgage loans that HSBC sold to Morgan Stanley and Goldman Sachs and has found that such loans were originated using inflated values and that HSBC made misrepresentations to these purchasers as to the underwriting, origination and quality of such mortgage loans. In addition, Relator has determined that HSBC and its affiliates breached representations and warranties in the related mortgage loan purchase agreements that HSBC by failing to report thousands of defective loans it sold to Morgan Stanley and Goldman Sachs.

220.    Relator's information reveals that HSBC, with reckless disregard, sold to Morgan Stanley and Goldman Sachs residential mortgage loans originated by HSBC (through its affiliates HSBC Mortgage, Household and Decision One) which were defective. HSBC knew that the loans it sold to Morgan Stanley and Goldman Sachs were to be resold to RMBS trusts sponsored by such entities. HSBC sold residential mortgage loans that it originated to Morgan Stanley and Goldman Sachs with representations and warranties (i) that the loans conformed to the applicable purchase contracts, (ii) that the loans were acceptable investments or investment quality, (iii) that all required loan data was true, correct, and complete, (iv) that no material misrepresentations were committed in connection with the loans; and (v) that they had not misstated or omitted any material fact about the loans; when, in fact, many of those representations or warranties were not accurate, as many of the loans were defective.

221.    HSBC provided a description of HSBC Mortgage or Decision One and its underwriting standards to Morgan Stanley and Goldman Sachs for use in the related prospectus supplement for the third-party MBS sponsored by such entities. For example,

prior to setting for the underwriting guidelines of Decision One, the prospectus supplement for Morgan Stanley ABS Capital I Inc. Trust 2006-HE5, states:

> The information set forth in the following paragraphs has been provided by Decision One Mortgage Company, LLC and relates solely to the mortgage loans acquired from Decision One.

6.       The prospectus then proceeds to set forth the underwriting guidelines of Decision One, substantially similar to the description of the Decision One underwriting guidelines set forth in the prospectus supplement for HSI 2007-HE2 and described in paragraphs 182 to 184, above.

222.     HSBC also knew that their loans were being included in such third-party MBS and that the representations and warranties that HSBC made to Morgan Stanley and Goldman Sachs in the related mortgage loan purchase agreements were going to be assigned by Morgan Stanley and Goldman Sachs to the RMBS trusts sponsored by such entities.

223.     Defendants' false and fraudulent statements were made for the first time prior to 2009 and have never been retracted and endure in form and effect to the present time. HSBC's failure to self report occurred after 2009 and continues to the present.

## VII.    THE U.S. GOVERNMENT FUNDED THE PURCHASE OF MBS AND CDOS AND SUFFERED SUBSTANTIAL LOSSES

### A.    PURCHASES BY THE U.S. GOVERNMENT

224.     The U.S. Government purchased or financed the purchase of MBS and CDOs through many avenues including, without limitation, through purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, the Federal Home Loan Banks, PPIFs, the Maiden Lane Entities, and Fannie Mae and Freddie Mac,

who each purchased or otherwise acquired billions of dollars of the MBS and CDOs with funding provided by the U.S. Government, and through direct purchases by the Federal Reserve and the Treasury (collectively, the "Government Purchasers").

225.     The Failed Credit Unions, Failed Banks and Failed Pension Plans were each federally insured institutions and one or more of such entities purchased MBS and CDOs, either directly or indirectly (including purchase of other CDOs that contained MBS or CDOs as collateral).

226.     In 2008, to respond to the financial crisis, the Federal Reserve Board authorized the FRBNY to facilitate the formation of three Maiden Lane Entities, each of which is a separate limited liability company. The assets and liabilities of each Maiden Lane Entity are consolidated onto the books of the FRBNY and are essentially owned by the FRBNY. The Maiden Lane Entities purchased or acquired Defendants' MBS and CDOs.

227.     On March 23, 2009, the U.S. Treasury, in conjunction with the FDIC and the Federal Reserve Bank, announced the creation of the Public-Private Investment Partnership ("PPIP") of 2009, as a part of the government's Financial Stability Plan. Under the PPIP, the Treasury provides equity and debt financing to newly-formed public-private investment funds ("PPIFs") established by fund managers with investors for the purpose of purchasing legacy securities from financial institutions. These securities include non-GSE RMBS.[13] The PPIF Managers purchased Defendants' MBS.

---

[13] According to a U.S. Treasury press release:

The PPIP is designed to encourage the transfer of certain illiquid legacy real estate-related assets off of the balance sheets of financial institutions, restarting the market for these assets and supporting the flow of credit and other capital into the broader economy. PPIP funds established under the legacy loan program will be established to purchase troubled loans from insured depository institutions and PPIP funds established under the legacy securities program to purchase from financial institutions legacy non-Agency RMBS and newly issued and legacy CMBS originally AAA rated. PPIFs will have access to equity capital from the U.S. Treasury as well as debt financing provided or guaranteed by the U.S. government.

## B. DAMAGES TO THE U.S. GOVERNMENT

### 1. IMPAIRED VALUE OF MBS

228.     Each of the Defendants named herein participated in originating and/or purchasing from third-party originators residential mortgage loans, which were included in the MBS trusts, and selling the MBS to investors, including to the U.S. Government, using the false records described herein. As set forth above, the Defendants, acting with reckless disregard of the truth, made false representations about the quality of the mortgage loans sold to the MBS trusts, including at the time the MBS were acquired by the U.S. Government. Such mortgage loans failed to conform to the underwriting standards of the originators and of the Defendants and failed to conform to the representations and warranties in the pooling and servicing agreements, trust agreements, assignment and assumption agreements and mortgage loan purchase agreements as disclosed in the Registration Statements and Offering Documents. Because of the false loan-level information, inflated values and other false records that Defendants provided to the rating agencies to obtain high credit ratings on the MBS, the investment grade MBS had inadequate subordination to absorb the massive losses from defective loans and collateral properties.

229.     In addition, each of the Defendants named herein participated in creating the MBS trusts that failed to include valid assignments or the original notes, and concealed such material fact from purchasers, including from the U.S. Government. As described herein, the Registration Statement for each of the MBS states that the original notes and valid assignments would be delivered on the closing date for each MBS trust.

230.     Because of the missing assignments and original notes, in any foreclosure action, the MBS trust will be unable, or will have to expend significant funds, to prove that the

trust is entitled to foreclose on the property. This is true especially for mortgages that are held in the name of "MERS" because MERS is not the owner of the mortgage note and MERS as nominee cannot lawfully commence a foreclosure action. The amount the MBS trusts will spend to prove they are entitled to foreclose is materially more than they would have spent if the Defendants delivered the original notes or a valid assignment in a timely manner as the Registration Statements stated had been done. In addition, the value of the MBS must be discounted to account for the risk that a court may not recognize the MBS trust as the legal owner of the note and mortgage, and may deny foreclosure on the mortgaged property. The cost to establish that the MBS trust is the owner of a note and mortgage is a financial harm to the U.S. Government, as a purchaser of the MBS.

231.    In all, as a result of Defendants' fraudulent conduct, the value of the MBS acquired and currently owned by the U.S. Government have been substantially impaired.

232.    The U.S. Government has realized losses on its purchases of MBS and CDOs as a result of Defendants' malfeasance. For example, one of the Failed Credit Unions purchased $50,000,000 principal amount of the Class II-A-3 Certificates (CUSIP 44328BAE8) issued by HSI 2006-HE2.

233.    The National Credit Union Administration, as Liquidating Agent, acquired such HSI 2006-HE2 securities as legacy assets and securitized such assets as part of the NCUA Guaranteed Note Program. The NCUA transferred such securities to the NCUA Guaranteed Notes Trust 2010-R3 in or around November 2010 and payment on the notes issued by such trust is guaranteed by the NCUA and backed by the full faith and credit of the United States. Since November 2010, the NCUA has reported that the $50,000,000 of Class Certificates of HSI 2006-HE2 owned by the NCUA 2010-R3 trust have suffered

cumulative realized losses of $15,145,402. As a result the NCUA has suffered similar losses on its guaranty.

### 2. IMPAIRED VALUE OF CDOS

234. Each of the Defendants named herein participated in originating certain of the MBS used as collateral for the CDOs. In addition, certain of the Defendants participated in purchasing RMBS from third parties included in the CDOs and selling the CDOs to purchasers, including to the U.S. Government (using the false documents described herein). As set forth above, HSBC Securities, acting with reckless disregard of the truth, omitted material information and made false representations about the quality of the MBS and RMBS included as collateral in the CDOs and failed to disclose to purchasers the lack of underwriting and quality control about the underwriting and acquisition of the mortgage loans underlying the MBS trusts whose securities the CDOs acquired.

235. As underwriter of the CDOs, HSBC Securities knew or should have known if it had conducted any due diligence, that the mortgage loans underlying the MBS used as collateral for the CDOs failed to conform to the underwriting standards of the originators, and knew or should have known that the investment grade credit ratings on such MBS were inflated and that such MBS trusts were missing the original mortgage notes and mortgage assignments.

236. As a result of Defendants' misconduct, the value of the CDOs acquired, insured, guaranteed or otherwise funded by the U.S. Government has been substantially impaired.

### 3. DAMAGE TO FANNIE MAE AND FREDDIE MAC

237. Fannie Mae and Freddie Mac (collectively, the "GSEs") each purchased or insured MBS and CDOs and incurred millions of dollars of losses on such securities

based on Defendants' material omissions and misrepresentations, false statements and claims.

238.    In addition, HSBC and its affiliates sold defective mortgage loans to the GSEs. Such loans were originated using inflated values and were sold to the GSEs based on material misrepresentations by HSBC as to the underwriting, origination and quality of such mortgage loans.

239.    As a result of Defendants' knowing, deliberate and reckless actions and the losses sustained by Fannie Mae and Freddie Mac from the purchase of the MBS and CDOs (and the defective mortgage loans), on September 6, 2008, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"); the U.S. Government has had to pay in excess of $180 billion to Fannie Mae and Freddie Mac.

240.    Defendants' knowing, deliberate and reckless conduct described herein has affected the investors in the GSEs, including numerous federally insured financial institutions (including the Failed Banks, Failed Credit Unions and the Failed Pension Plans) who incurred stock losses and unpaid dividends resulting from the conservatorship of the GSEs. The placement of Fannie Mae and Freddie Mac into conservatorship wiped out virtually all of the value of the outstanding preferred stock in the two companies.

### 4.    DAMAGES TO THE FAILED CREDIT UNIONS, THE FAILED BANKS, THE FAILED PENSION PLANS

241.    One or more of the Failed Banks, Failed Credit Unions and Failed Pension Plans purchased MBS and/or CDOs and incurred millions of dollars of losses on such securities based on Defendants' material omissions and misrepresentations, false statements and claims. As a result of Defendants' knowing, deliberate and reckless actions and the

losses sustained by such entities from the purchase of the MBS and CDOs, such entities failed and the U.S. Government has had to pay millions of dollars in connection with the failure of such entities.

### 5.   DAMAGES FROM AIG BAILOUT

242.     AIG purchased or insured billions of dollars of MBS and CDOs and incurred billions of dollars of losses on such securities based on Defendants' material omissions and misrepresentations, false statements and claims.  AIG entered into credit default swaps with HSBC in which HSBC obtained insurance from AIG on billions of dollars of CDOs based on Defendants' material omissions and misrepresentations, false statements and claims with respect to such CDOs.  Under the Maiden Lane III transaction, HSBC was paid tens of millions of dollars for the insured CDOs and HSBC was allowed to retain the $200,000,000 of cash collateral previously posted by AIG in exchange for terminating the credit default swaps (in excess of $200,000,000 total).

243.     Also, AIG entered into securities lending arrangements with HSBC where AIG obtained cash from HSBC and AIG purchased HSBC MBS based on Defendants' material omissions and misrepresentations, false statements and claims.  HSBC was paid $3.3 billion from Treasury funds used to bail out AIG and to repay AIG's securities lending counterparties.

244.     As a result of Defendants' knowing, deliberate and reckless actions and the losses sustained by AIG, on September 16, 2008, the Federal Reserve provided AIG with an $85 billion credit line.  In addition, on October 3, 2008, AIG received a $37.8 billion bailout from the Treasury under the Troubled Asset Relief Program (TARP).   On November 25, 2008, AIG received an additional $40 billion under TARP and on March 2, 2009, AIG received an additional commitment of $29.8 billion under TARP, in each

case as a result of Defendants' misconduct described herein. Because the Government had billions invested in AIG through various government programs, the Government suffered losses (or forgone profits) on these investments due to the damage caused to AIG by Defendants' misconduct described herein.

## VIII.   CLAIMS FOR RELIEF

**A.**   **For   Damages   And   Penalties   Under   The   False   Claims   Act (31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))**

245.       Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

246.       As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, failed to disclose material information and made false representations about the quality of the mortgage loans included in the MBS at the time of their sale to the trustee for the benefit of the certificate holders of the related MBS trust and failed to correct these material omissions and false representations thereafter.

247.       As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, failed to disclose material information and made false representations about the quality of the MBS and RMBS securing the CDOs and the mortgage loans securing such MBS at the time of sale to the related CDO and failed to correct these material omissions and false representations thereafter.

248.       As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, presented and/or caused to be presented, a false or fraudulent claim for payment or approval in connection with the sale of the mortgage

loans to the MBS, the sale of the MBS and other RMBS to the CDOs and the sale of the MBS and the CDOs to the Government Purchasers.

249.　　As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, sold defective mortgage loans directly to the GSEs and the other Government Purchasers. Such loans were originated using inflated values and were sold to the Government Purchasers based on material misrepresentations by HSBC as to the underwriting, origination and quality of such mortgage loans. As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, presented and/or caused to be presented, a false or fraudulent claim for payment or approval in connection with the sale of the mortgage loans to the Government Purchasers.

250.　　Defendants' misrepresentations and omissions were capable of influencing, and thus were material to, the Government Purchasers' decisions about purchasing, financing, insuring or guaranteeing, directly or indirectly, the MBS and the CDOs and the Government Purchasers' decisions about purchasing the mortgage loans.

251.　　The U.S. Government has purchased or financed, insured or guaranteed, directly or indirectly, the purchase of the MBS, the CDOs and the mortgage loans through many Government Purchasers, including, without limitation, through purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, PPIFs, the Maiden Lane Entities, the Federal Home Loan Banks, AIG, U.S. Treasury, and Fannie Mae and Freddie Mac. Each such purchaser is "a contractor, grantee, or other recipient" within the meaning of 31 U.S.C. § 3729(b)(2). In addition, the U.S. Government funds used to bail out the Failed Credit Unions, the Failed Banks, the Failed Pension Plans,

99

AIG and Fannie Mae and Freddie Mac, and to finance the PPIFs and the Maiden Lane Entities, were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2). The U.S. Government "reimbursed" such purchasers of the MBS and CDOs for damages they suffered from the false and fraudulent claims for payment made by Defendants. The U.S Government has incurred losses as a direct result of the Defendants' misrepresentations and omissions

252. By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(A), for each of the mortgage loans sold to the MBS that failed to conform to the disclosures in the Registration Statements or failed to conform to the representations and warranties made by the Defendants in the pooling and servicing agreements, mortgage loan purchase agreements, or similar documents such as trust agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, presented and/or caused to be presented a fraudulent claim for payment or approval.

253. By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(A), for each of the mortgage loans sold to the Government Purchasers that failed to conform to the representations and warranties made to the Government Purchasers, including those set forth in the Fannie Guide and Freddie Guide, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, presented and/or caused to be presented a fraudulent claim for payment or approval.

254. Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(l), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent

claim herein, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

**B.    For    Damages    and    Penalties    Under    the    False    Claims Act U.S.C. § 3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B)**

255.        Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

256.        As set forth above, Defendants' knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with the sale of the mortgaged loans to the trustee on behalf of the Certificate holders of the MBS, the sale of the RMBS and other mortgage collateral to the CDOs and the sale of the MBS and the CDOs to the Government Purchasers.

257.        As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with the sale of the mortgaged loans to the Government Purchasers.

258.        Defendants' misrepresentations and omissions were capable of influencing, and thus were material to, the Government Purchasers' decisions about purchasing, financing, insuring or guaranteeing, directly or indirectly, the MBS, the CDOs and the mortgage loans.

259.        U.S. Government funds have been used to purchase the MBS, the CDOs and the mortgage loans and to reimburse the losses incurred by the Government Purchasers from their purchases of the MBS, the CDOs and the mortgage loans. The U.S Government has incurred losses as a direct result of the Defendants' misrepresentations and omissions.

260.     By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(1)(B), for each of the mortgage loans sold to the MBS that failed to conform to the disclosures in the Registration Statements or failed to conform to the representations and warranties in the pooling and servicing agreements, mortgage loan purchase agreements or similar documents such as trust agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims.

261.     By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(B), for each of the mortgage loans sold to the Government Purchasers that failed to conform to the representations and warranties made to the Government Purchasers, including those set forth in the Fannie Guide and Freddie Guide, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims.

262.     Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

C.     **For Damages and Penalties Under the False Claims Act (31 U.S.C. § 3729(a)(7)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(G))**

263.     Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

264.    As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, concealed or improperly avoided or decreased their obligations to repurchase defective mortgage loans from the MBS trusts in accordance with their obligations as disclosed in the Registration Statements and/or under the pooling and servicing agreements, mortgage loan purchase agreements or similar documents such as trust agreements.

265.    As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, concealed or improperly avoided or decreased its obligation to repurchase defective mortgage loans from Fannie Mae and Freddie Mac in accordance with their obligations under the Fannie Guide and Freddie Guide, respectively, and/or applicable purchase contracts.

266.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(1)(G), for each of the mortgage loans sold to the MBS that failed to conform to the representations and warranties in the pooling and servicing agreements, mortgage loan purchase agreements or similar documents such as trust agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, concealed or improperly avoided or decreased its obligation to repurchase defective mortgage loans from the MBS trusts.

267.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(G), for each of the mortgage loans sold to the Government Purchasers that failed to conform to the representations and warranties made to the Government Purchasers, including those set forth in the Fannie Guide and Freddie Guide, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth,

concealed or improperly avoided or decreased its obligation to repurchase defective mortgage loans from the Government Purchasers.

268.     Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each mortgage loan it improperly failed to repurchase, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

## IX.     PRAYER FOR RELIEF

269.     WHEREFORE, the Relator respectfully requests that judgment be entered in its favor and against Defendants as follows:

(a)     On Counts One, Two and Three (False Claims Act), a judgment against all Defendants for treble damages and civil penalties for the maximum amount allowed by law;

(b)     For an award of costs pursuant to 31 U.S.C. § 3729(a) and 31 U.S.C. § 3730(d); and

(c)     For such further relief that the Court deems just.

## X.     DEMAND FOR TRIAL BY JURY

The Relator respectfully demands a trial by jury for all issues so triable as a matter of right.

RESPECTFULLY SUBMITTED this 17 day of March, 2016.



By: *Francis P. Karam*

Francis P. Karam
Law Office of Francis P. Karam
175 Varick Street, #345
New York, NY 10014
Phone: (212) 489-3900
E-Mail: frank@fkaramlaw.com


*Counsel for Relator*

# ANNEX A
## MBS

This list is deemed to include (i) any MBS trusts sponsored, underwritten or sold by HSBC and (ii) any third-party MBS for which HSBC Mortgage or Decision One acted as originator and which included a description of HSBC Mortgage or Decision One and its underwriting standards in the related prospectus supplement for such third-party MBS, that are not listed here.

| |
|---|
| HASC 2005-I1 |
| HASC 2005-NC1 |
| HASC 2005-NC2 |
| HASC 2005-OPT1 |
| HASC 2006-HE1 |
| HASC 2006-HE2 |
| HASC 2006-NC1 |
| HASC 2006-OPT1 |
| HASC 2006-OPT2 |
| HASC 2006-OPT3 |
| HASC 2006-OPT4 |
| HASC 2006-WMC1 |
| HASC 2007-HE1 |
| HASC 2007-HE2 |
| HASC 2007-NC1 |
| HASC 2007-OPT1 |
| HASC 2007-WF1 |

| |
|---|
| FFML 2006-FF1 |
| FFML 2006-FF5 |
| FFML 2006-FF7 |
| FFML 2006-FF9 |
| FFML 2006-FF11 |

| |
|---|
| HALO 2006-2 |
| HALO 2007-1 |
| HALO 2007-2 |

| |
|---|
| HALO 2007-AR1 |
| HALO 2007-AR2 |
| HALO 2007-WF1 |
| HSBC Home Equity 2005-1 |
| HSBC Home Equity 2005-2 |
| HSBC Home Equity 2005-3 |
| HSBC Home Equity 2006-1 |
| HSBC Home Equity 2006-2 |
| HSBC Home Equity 2006-3 |
| HSBC Home Equity 2006-4 |
| HSBC Home Equity 2007-1 |
| HSBC Home Equity 2007-2 |
| HSBC Home Equity 2007-3 |
| HSBC 2005-RM1 |
| HSBC 2005-RM2 |
| |
| |

## ANNEX B

### CDOs


**This list is deemed to include any CDOs sponsored, underwritten or sold by HSBC that are not listed here**

## ANNEX C

Failed Credit Unions

2014
Life Line Credit Union Inc.
Health One Credit Union
Mayfair Federal Credit Union
Parsons Pittsburg Credit Union
St. Francis Campus Credit Union

2013
Bagumbayan Credit Union
Polish Combatants Credit Union
Mayfair Federal Credit Union,
Craftsman Credit Union,
Greater Oregon Federal Credit Union
Taupa Lithuanian Credit Union
PEF Federal Credit Union
Zane Trace Federal Credit Union,
Ochsner Clinic Federal Credit Union
First Kingdom CommUnity Credit Union
Electrical Workers #527 Federal Credit Union
Lynrocten Federal Credit Union
Shiloh of Alexandria Federal Credit Union
I.C.E. Credit Union
Pepsi Cola Federal Credit Union
Amez United Credit Union
NCP CommUnity Development Federal Credit Union
New Covenant Missionary Baptist Church Credit Union

2012
Border Lodge Credit Union
G.I.C. Federal Credit Union
Olean Federal Credit Union
Chetco Federal Credit Union
Women's Southwest Federal Credit Union
El Paso Federal Credit Union
United Catholic Credit Union
Eastern New York Federal Credit Union
People for People CommUnity Development Credit Union
Saguache County Credit Union
Shepherd's Federal Credit Union
Wausau Postal Employees Credit Union

Telesis CommUnity Credit Union
A M CommUnity Credit Union

2011
<u>Oakland Municipal Credit Union</u>
Family First Federal Credit Union
NYC OTB Federal Credit Union
Wisconsin Heights Credit Union
Land of Enchantment Federal Credit Union
Mission San Francisco Federal Credit Union
Utah Central Federal Credit Union
Hmong American Federal Credit Union
Valued Members Federal Credit Union
St. James A.M.E. Federal Credit Union
Borinquen Federal Credit Union
Vensure Federal Credit Union

2010
Kern Central Credit Union  California
Friendship CommUnity Federal Credit Union  Mississippi
Mutual Diversified Employees Federal Credit Union  California
Lawrence County School Employees Federal Credit Union  PA
South End Mutual Benefit Association, Inc.  Connecticut
Tracy Federal Credit Union  California
St. Paul's Croatian Federal Credit Union Ohio
Convent Federal Credit Union  New York
Orange County Employees Credit Union  Texas
Southwest CommUnity Federal Credit Union  Utah
Norbel Credit Union  Utah
Certified Federal Credit Union  California
Kappa Alpha Psi  Texas
First American Credit Union  Wisconsin
Industries Puerto Rico Federal Credit Union  Puerto Rico
Phil-Pet Federal Credit Union  Texas
The Union Credit Union  Washington
Constitution Corporate Federal Credit Union  Connecticut
Beehive Credit Union

2009

<u>Heritage West Federal Credit Union</u>
Fairfield County Ohio Federal Employees Credit Union
Ensign Federal Credit Union
Second Baptist Church Credit Union
West Texas Credit Union
Members Own Credit Union
Clearstar Federal Credit Union

Comunidades Federal Credit Union
Kaiser Lakeside Credit Union
Free Choice Federal Credit Union
CommUnity One Credit Union
Watts United Credit Union
High Desert FCU
Rouge Employees Credit Union
Center Valley Federal Credit Union

2008

West Hartford CU
N&W Poca Division FCU
Texdot WF Credit Union
Kaiperm FCU
Interfaith FCU
Port Trust FCU
New London Security FCU
Meriden F.A. FCU
Cal State 9 Credit Union
Sterlent Credit Union
Father Burk FCU
St. Luke Babtist FCU
Norlarco Credit Union
Valley Credit Union
High Desert FCU

2007

Homeowners Association Credit Union
Huron River Area CU
Green Tree CU
New Horizons CommUnity Credit Union:
Cambria CU
Sharebuilders CU
State & Parish Employees FCU

2006

Marian Miami FCU
Mt. Hebron Babtist FCU
La Casa Federal Credit Union
Dedicators Federal Credit Union
I.L.A. 24 CU
Orleans Public Schools FCU
Punjab and Sindh FCU
Yankton Employee CU

Potter's House CU
St. Charles Borromea Church CU
St. John Babtist CU
Greater Harrisburg CommUnity CU

<u>2005</u>

Good Samaritan Employees CU
Lorain Sacred Heard CU
Korean-American Chamber of Commerce CU
Jilapuhn Employees FCU
Homesteaders CU
Lock Haven Area FCU
Jamaica Postal Credit Union
Miss-Lou Federal Credit Union
Randolph Country FCU
Ko-Am FCU

## ANNEX D

Failed Banks

First Cherokee State Bank

Georgia Trust Bank

The Royal Palm Bank of Florida

Glasgow Savings Bank

Montgomery Bank & Trust

The Farmers Bank of Lynchburg

Security Exchange Bank

Putnam State Bank

Waccamaw Bank

Farmers' and Traders' State Bank

Carolina Federal Savings Bank

First Capital Bank

Alabama Trust Bank, National Association

Security Bank, National Association

Palm Desert National Bank

Plantation Federal Bank

Inter Savings Bank, fsb D/B/A InterBank, fsb

HarVest Bank of Maryland

Bank of the Eastern Shore

Fort Lee Federal Savings Bank, FSB

Fidelity Bank

Premier Bank

Covenant Bank & Trust

New City Bank

Global Commerce Bank

Home Savings of America

Central Bank of Georgia

SCB Bank

Charter National Bank and Trust

BankEast

Patriot Bank Minnesota

Tennessee Commerce Bank

First Guaranty Bank and Trust Company of Jacksonville

American Eagle Savings Bank

The First State Bank

Central Florida State Bank

Western National Bank

Premier CommUnity Bank of the Emerald Coast

Central Progressive Bank

Polk County Bank

CommUnity Bank of Rockmart

SunFirst Bank

Mid City Bank, Inc.

All American Bank

CommUnity Banks of Colorado

CommUnity Capital Bank

Decatur First Bank

Old Harbor Bank

Country Bank

First State Bank

Blue Ridge Savings Bank, Inc.

Piedmont CommUnity Bank

Sun Security Bank

The RiverBank

First International Bank

Citizens Bank of Northern California

Bank of the Commonwealth

The First National Bank of Florida

CreekSide Bank

Patriot Bank of Georgia

First Choice Bank

First Southern National Bank

Lydian Private Bank

Public Savings Bank

The First National Bank of Olathe

Bank of Whitman

Bank of Shorewood

Integra Bank National Association

BankMeridian, N.A.

Virginia Business Bank

Bank of Choice

LandMark Bank of Florida

Southshore CommUnity Bank

Summit Bank

First Peoples Bank

High Trust Bank

One Georgia Bank

Signature Bank

Colorado Capital Bank

First Chicago Bank & Trust

Mountain Heritage Bank

First Commercial Bank of Tampa Bay

McIntosh State Bank

Atlantic Bank and Trust

First Heritage Bank

Summit Bank

First Georgia Banking Company

Atlantic Southern Bank

Coastal Bank

CommUnity Central Bank

The Park Avenue Bank

First Choice CommUnity Bank

Cortez CommUnity Bank

First National Bank of Central Florida

Heritage Banking Group

Rosemount National Bank

Superior Bank

Nexity Bank

New Horizons Bank

Bartow County Bank

Nevada Commerce Bank

Western Springs National Bank and Trust

The Bank of Commerce

Legacy Bank

First National Bank of Davis

Valley CommUnity Bank

San Luis Trust Bank, FSB

Charter Oak Bank

Citizens Bank of Effingham

Habersham Bank

Canyon National Bank

Badger State Bank

Peoples State Bank

Sunshine State CommUnity Bank

CommUnity First Bank Chicago

North Georgia Bank

American Trust Bank

First CommUnity Bank

FirsTier Bank

Evergreen State Bank

The First State Bank

United Western Bank

The Bank of Asheville

CommUnitySouth Bank & Trust

Enterprise Banking Company

Oglethorpe Bank

Legacy Bank

First Commercial Bank of Florida

CommUnity National Bank

First Southern Bank

United Americas Bank, N.A.

Appalachian CommUnity Bank, FSB

Chestatee State Bank

The Bank of Miami, N.A.

Earthstar Bank

Paramount Bank

First Banking Center

Allegiance Bank of North America

Gulf State CommUnity Bank

Copper Star Bank

Darby Bank & Trust Co.

Tifton Banking Company

First Vietnamese American Bank

Pierce Commercial Bank

Western Commercial Bank

K Bank

First Arizona Savings, A FSB

Hillcrest Bank

First Suburban National Bank

The First National Bank of Barnesville

The Gordon Bank

Progress Bank of Florida

First Bank of Jacksonville

Premier Bank

WestBridge Bank and Trust Company

Security Savings Bank, F.S.B.

Shoreline Bank

Wakulla Bank

North County Bank

Haven Trust Bank Florida

Maritime Savings Bank

Bramble Savings Bank

The Peoples Bank

First Commerce CommUnity Bank

Bank of Ellijay

ISN Bank

Horizon Bank

Sonoma Valley Bank

Los Padres Bank

Butte CommUnity Bank

Pacific State Bank

ShoreBank

Imperial Savings and Loan Association

Independent National Bank

CommUnity National Bank at Bartow

Palos Bank and Trust Company

Ravenswood Bank

LibertyBank

The Cowlitz Bank

Coastal CommUnity Bank

Bayside Savings Bank

Northwest Bank & Trust

Home Valley Bank

SouthwestUSA Bank

CommUnity Security Bank

Thunder Bank

Williamsburg First National Bank

Crescent Bank and Trust Company

Sterling Bank

Mainstreet Savings Bank, FSB

Olde Cypress CommUnity Bank

Turnberry Bank

Metro Bank of Dade County

First National Bank of the South

Woodlands Bank

Home National Bank

USA Bank

Ideal Federal Savings Bank

Bay National Bank

High Desert State Bank

First National Bank

Peninsula Bank

Nevada Security Bank

Washington First International Bank

TierOne Bank

Arcola Homestead Savings Bank

First National Bank

Sun West Bank

Granite CommUnity Bank, NA

Bank of Florida - Tampa

Bank of Florida - Southwest

Bank of Florida - Southeast

Pinehurst Bank

Midwest Bank and Trust Company

Southwest CommUnity Bank

New Liberty Bank

Satilla CommUnity Bank

1st Pacific Bank of California

Towne Bank of Arizona

Access Bank

The Bank of Bonifay

Frontier Bank

BC National Banks

Champion Bank

CF Bancorp

Westernbank Puerto Rico

R-G Premier Bank of Puerto Rico

Eurobank

Wheatland Bank

Peotone Bank and Trust Company

Lincoln Park Savings Bank

New Century Bank

Citizens Bank and Trust Company of Chicago

Broadway Bank

Amcore Bank, National Association

City Bank

Tamalpais Bank

Innovative Bank

Butler Bank

Riverside National Bank of Florida

AmericanFirst Bank

First Federal Bank of North Florida

Lakeside CommUnity Bank

Beach First National Bank

Desert Hills Bank

Unity National Bank

Key West Bank

McIntosh Commercial Bank

State Bank of Aurora

First Lowndes Bank

Bank of Hiawassee

Appalachian CommUnity Bank

Advanta Bank Corp.

Century Security Bank

American National Bank

Statewide Bank

Old Southern Bank

The Park Avenue Bank

LibertyPointe Bank

Centennial Bank

Waterfield Bank

Bank of Illinois

Sun American Bank

Rainier Pacific Bank

Carson River CommUnity Bank

La Jolla Bank, FSB

George Washington Savings Bank

The La Coste National Bank

Marco CommUnity Bank

1st American State Bank of Minnesota

American Marine Bank

First Regional Bank

CommUnity Bank and Trust

Marshall Bank, N.A.

Florida CommUnity Bank

First National Bank of Georgia

Columbia River Bank

Evergreen Bank

Charter Bank

Bank of Leeton

Premier American Bank

Barnes Banking Company

St. Stephen State Bank

Town CommUnity Bank & Trust

Horizon Bank

First Federal Bank of California, F.S.B.

Imperial Capital Bank

Independent Bankers' Bank

New South Federal Savings Bank

Citizens State Bank

Peoples First CommUnity Bank

RockBridge Commercial Bank

SolutionsBank

Valley Capital Bank, N.A.

Republic Federal Bank, N.A.

Greater Atlantic Bank

Benchmark Bank

AmTrust Bank

The Tattnall Bank

First Security National Bank

The Buckhead CommUnity Bank

Commerce Bank of Southwest Florida

Pacific Coast National Bank

Orion Bank

Century Bank, F.S.B.

United Commercial Bank

Gateway Bank of St. Louis

Prosperan Bank

Home Federal Savings Bank

United Security Bank

North Houston Bank

Madisonville State Bank

Citizens National Bank

Park National Bank

Pacific National Bank

California National Bank

San Diego National Bank

CommUnity Bank of Lemont

Bank USA, N.A.

First DuPage Bank

Riverview CommUnity Bank

Bank of Elmwood

Flagship National Bank

Hillcrest Bank Florida

American United Bank

Partners Bank

San Joaquin Bank

Southern Colorado National Bank

Jennings State Bank

Warren Bank

Georgian Bank

Irwin Union Bank, F.S.B.

Irwin Union Bank and Trust Company

Venture Bank

Brickwell CommUnity Bank

Corus Bank, N.A.

First State Bank

Platinum CommUnity Bank

Vantus Bank

InBank

First Bank of Kansas City

Affinity Bank

Mainstreet Bank

Bradford Bank

Guaranty Bank

CapitalSouth Bank

First Coweta Bank

ebank

CommUnity Bank of Nevada

CommUnity Bank of Arizona

Union Bank, National Association

Colonial Bank

Dwelling House Savings and Loan Association

CommUnity First Bank

CommUnity National Bank of Sarasota County

First State Bank

Mutual Bank

First BankAmericano

Peoples CommUnity Bank

Integrity Bank

First State Bank of Altus

Security Bank of Jones County

Security Bank of Houston County

Security Bank of Bibb County

Security Bank of North Metro

Security Bank of North Fulton

Security Bank of Gwinnett County

Waterford Village Bank

Temecula Valley Bank

Vineyard Bank

BankFirst

First Piedmont Bank

Bank of Wyoming

Founders Bank

Millennium State Bank of Texas

First National Bank of Danville

Elizabeth State Bank

Rock River Bank

First State Bank of Winchester

John Warner Bank

Mirae Bank

MetroPacific Bank

Horizon Bank

Neighborhood CommUnity Bank

CommUnity Bank of West Georgia

First National Bank of Anthony

Cooperative Bank

Southern CommUnity Bank

Bank of Lincolnwood

Citizens National Bank

Strategic Capital Bank

BankUnited, FSB

Westsound Bank

America West Bank

Citizens CommUnity Bank

Silverton Bank, NA

First Bank of Idaho

First Bank of Beverly Hills

Michigan Heritage Bank

American Southern Bank

Great Basin Bank of Nevada

American Sterling Bank

New Frontier Bank

Cape Fear Bank

Omni National Bank

TeamBank, NA

Colorado National Bank

FirstCity Bank

Freedom Bank of Georgia

Security Savings Bank

Heritage CommUnity Bank

Silver Falls Bank

Pinnacle Bank of Oregon

Corn Belt Bank & Trust Co.

Riverside Bank of the Gulf Coast

Sherman County Bank

County Bank

Alliance Bank

FirstBank Financial Services

Ocala National Bank

Suburban FSB

MagnetBank

1st Centennial Bank

Bank of Clark County

National Bank of Commerce

Sanderson State Bank

Haven Trust Bank

First Georgia CommUnity Bank

PFF Bank & Trust

Downey Savings & Loan

CommUnity Bank

Security Pacific Bank

Franklin Bank, SSB

Freedom Bank

Alpha Bank & Trust

Meridian Bank

Main Street Bank

Washington Mutual Bank (Including its subsidiary Washington Mutual Bank FSB)

Ameribank

Silver State Bank

Integrity Bank

Columbian Bank & Trust

First Priority Bank

First Heritage Bank, NA

First National Bank of Nevada

IndyMac Bank

First Integrity Bank, NA

ANB Financial, NA

Hume Bank

Douglass National Bank

Miami Valley Bank

NetBank

Metropolitan Savings Bank

Bank of Ephraim

Reliance Bank

Guaranty National Bank of Tallahassee

Dollar Savings Bank